[No. C051108. Third Dist. Jan. 22, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW WRIGHT GILL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, III, IV, and VI.

## COUNSEL

Diane Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, and Michael Dolida, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**CANTIL-SAKAUYE, J.**—In January 2004, defendant Andrew Wright Gill and his wife T.G. were having marital problems. T.G. gave defendant until the end of the month to find a job and get help for his depression. On the morning of January 31, 2004, T.G. told defendant to leave the house. Defendant left but returned to break into the house and threaten, assault, sexually abuse and kidnap T.G.

A jury convicted defendant of 10 felonies: kidnapping to commit spousal rape, rape by a foreign object and forcible oral copulation (Pen. Code, § 209, subd.(b)(1)[1]—count 1); spousal rape (§ 262, subd. (a)(1)—count 2); rape by a foreign object (§ 289, subd. (a)(1)—counts 3 & 4); forcible oral copulation (§ 288a, subd. (c)(2)—count 5); making criminal threats (§ 422—count 6); attempted rape by a foreign object (§§ 664 & 289, subd. (a)—count 7); infliction of corporal injury on a spouse (§ 273.5, subd. (a)—count 8); cutting a utility line (§ 591—count 9); and residential burglary (§ 459—count 10). The jury also found true four special allegations relating to the sex crimes (§§ 667.61, subds. (a), (d)(2), (4), (e)(1), (6), 667.8, subd. (a).) The court sentenced defendant to an aggregate term of 64 years eight months to life, including the upper term of eight years in count 3.

Defendant makes six arguments on appeal: (1) the court violated his constitutional rights by denying his motion to disqualify the district attorney's office; (2) the court erred in admitting the statements he made to police; (3) the court erred in admitting evidence of prior acts of domestic abuse against T.G.; (4) the court erred in rejecting his claim of prosecutorial misconduct; (5) the court erred in sentencing him to the upper term in count 3; and (6) the evidence was insufficient to support his conviction for residential burglary in count 10. We affirm the judgment.

[1] Hereafter, undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Mark Gantt had lived next door to the Gills for several years and saw them every day or so. On the morning of January 31, 2004, he met defendant for breakfast at Denny's restaurant around 9:00 a.m. Defendant was "very agitated" and told Gantt that T.G. would not let him back in the house. Gantt tried to calm defendant and advised him to stay away from the house to avoid causing more problems.

Gantt met defendant later that morning at Home Depot at T.G.'s request. T.G. had given Gantt a suitcase, $50 and a note to deliver to defendant. The gist of the note was "get a job, be accountable, and talk to me." Gantt collected a set of house keys from defendant and returned them to T.G.

Between noon and 1:00 p.m., Gantt observed that defendant had parked his car in front of the house. Gantt spoke with T.G. on the phone. She told him that she was afraid of what defendant might do. Gantt went outside and spoke with defendant for 15 or 20 minutes. According to Gantt, defendant was very upset. Gantt spoke with defendant a second time an hour later, describing defendant as "very, very upset."

At that point, Gantt advised T.G. to call the police and called the police himself. The police officers arrived around 4:00 p.m. and spoke with both defendant and T.G. T.G. asked for an emergency protective order, but the request was denied. The officers suggested to defendant and T.G. that one of them leave in order to avoid any further problems. Defendant responded that it was unfair for him to leave. He told the officers that he intended to wait in his car until T.G. allowed him back into the house.

Defendant telephoned his house around dinnertime in an attempt to resolve things with T.G., but she did not answer. Defendant left a message indicating that, "there was going to be trouble" if T.G. did not speak to him.

Gantt met with defendant in front of the house for a third time later that evening. He urged defendant to leave, but gave him a blanket in case he decided to stay. Defendant indicated that he planned to stay at a friend's house. Gantt checked around 11:00 p.m. and defendant's car was gone.

*The Assault and Kidnap of T.G.*

Just after 1:00 a.m., T.G. heard a loud bang on the front door.[2] She ran to the room of her 10-year-old son D.G. to look out the front of the house. T.G.

---

[2] T.G.'s account of the events is taken from her trial testimony, her interview with police detectives on February 1, 2004, and her interview with the deputy district attorneys on February 10, 2004.

ran back to her bedroom and heard another loud crash that sounded like glass breaking. She tried to telephone Gantt but the line was dead.

A few seconds later, defendant walked into the bedroom, turned on the lights, and said, "[S]urprise." T.G. testified that defendant was "really angry," cursing and calling her a "f---ing bitch." Defendant grabbed T.G. by the hair and slapped her across the mouth. He hit her again when she tried to get a Kleenex to wipe her bloody lip. Defendant pulled T.G. around the room by her hair and kicked her in the side when she fell to the ground. He dragged T.G. to a futon couch near the window and told her that she had "made the biggest mistake of [her] life," and was going to "pay tonight," and was going to "die tonight."

T.G. testified that it was like defendant had "snapped" and it was not the first time it had happened. She could recall three incidents where he yelled and hit her.

Defendant dragged T.G. from the bedroom to the garage. Once there, defendant forced T.G. to lie facedown on the floor and take off all of her clothes. He put a rag in T.G.'s mouth and taped it in place by wrapping duct tape around her head. Defendant threatened to cut off T.G.'s right arm with a chainsaw.

Defendant proceeded to sexually abuse T.G. in the garage. First, defendant put his fist up her vagina. He then inserted a flashlight in T.G.'s vagina and tried to insert it in her anus. Next, defendant raped T.G. by inserting his penis in her vagina, but he stopped before ejaculating.

Defendant took T.G. back into the house and continued to threaten T.G., stating, "You're going to pay for what you did to me," and "You're dying tonight." Defendant asked T.G. if she wanted to say goodbye to anyone.

Defendant put T.G. in the backseat of the family car, facedown, completely naked. He bound her feet together at the ankles and tied her feet to her wrists with rope. Defendant drove toward Sacramento.

Eventually, defendant reached back and removed the duct tape from T.G.'s head and the gag from her mouth, tearing out pieces of hair in the process. As they got closer to a snowy area, defendant pulled off the road and got in the backseat with T.G. He forced her to orally copulate him. He ejaculated in T.G.'s mouth and told her to swallow it. T.G. cooperated because she was "scared to death for [her] life." At that point, defendant allowed T.G. to get dressed and join him in the front seat of the car. However, he tied her hands and feet together to prevent her from doing "something stupid up front."

Now that T.G. was sitting upright in the seat, she saw that they were close to Lake Tahoe. It was after 5:00 a.m. As they drove toward Emerald Bay, defendant said, "I'm obviously going to have to end my life today." He told T.G. that she would have to give something up, like a finger or a hand, so that she would "always remember what [she had done] to [defendant]." When they reached an area called Sugar Pine Camp, defendant parked the car and unsuccessfully tried to kill himself with a hunting bow.

Around daylight, defendant drove out of the campground to a small market. He left T.G. in the car while he bought a pack of disposable razors and a banana and bottle of water for T.G. Defendant told T.G. that he was going to take her home, but changed his mind and drove back to the campground. He said, "I can't go home, I'll go to jail . . . there's a warrant for me, I can't wait for that."

Defendant and T.G. sat in the campground while defendant tried to kill himself with a disposable razor. He also placed a plastic bag over his head. These attempts at suicide also failed. According to T.G., defendant appeared to realize that he did not want to kill himself. He started toward home again and T.G. encouraged him. As they were driving, defendant cried and apologized to T.G. for causing her so much pain over the years.

*Defendant Turns Himself In*

Back in Stockton, D.G., one of defendant and T.G.'s sons, knocked at Gantt's door between 7:30 and 8:00 a.m. He told Gantt that his mother was gone. Gantt and his adult son hurried to the Gill residence. Finding parts of the house in disarray, signs of forced entry, the family car missing, the outside telephone jack removed, and defendant's car parked around the corner, Gantt and his son called the police.

Detective Robert Molthen questioned the children, D.G. and C.G., about what had happened the night before. D.G. told Molthen that he had heard a commotion or arguing in the middle of the night. During the interview with D.G., Molthen also learned about a prior incident of abuse. D.G. told the detective that when he was five, he had seen defendant push T.G. onto a couch and throw things at her.

Defendant phoned home while Detective Molthen was at the Gill residence. Molthen told defendant to go to the nearest police station. Defendant allowed Molthen to speak with T.G. Molthen asked T.G. if she was okay and she responded, "I don't think so." Molthen then asked T.G. if she was being held against her will, and she said, "[N]o."

A few minutes later, defendant arrived at the police station in Jackson. Defendant was still talking with Detective Molthen on the cell phone when

he told Jackson Police Officer Curt Campbell that the Stockton police were looking for him. Molthen talked with Campbell on defendant's cell phone and told Campbell to detain defendant and T.G. Molthen, his partner Detective Eduardo Rodriguez, and two other officers headed for Jackson.

Meanwhile, Officer Campbell instructed defendant to sit on a bench outside the police station. Campbell noticed fresh and dried blood on defendant's neck. When he asked defendant how the injury occurred, defendant did not respond. Campbell also spoke with T.G., who was sitting in the front passenger seat of the car. T.G. told Campbell that defendant cut his neck with the blade from a Bic razor. Campbell also noticed that T.G. had a bloody lip. T.G. told him that defendant had hit her. Campbell retrieved a plastic bag from the car that contained the razor blade and duct tape with brown hair attached to it. Paramedics arrived and began to treat defendant's and T.G.'s injuries. T.G. stated to the paramedics or Campbell that defendant had raped her.

After the Stockton police officers arrived in Jackson, Campbell gave the plastic bag to Detective Mark Reynolds. The bag contained a 12-foot length of rope in addition to the razor blade and duct tape. Reynolds and another officer transported defendant back to Stockton in their car. They did not question defendant during that trip.

*T.G.'s Pretrial Statements*

Detective Molthen interviewed T.G. for approximately 30 minutes in the backseat of his police car before they left Jackson. He and Detective Rodriguez continued to interview her during the drive from Jackson to the emergency room at San Joaquin County General Hospital in Stockton.

At the hospital, Rodriguez went through the adult/adolescent sexual assault examination questionnaire with T.G., writing down her responses. At no time did T.G. indicate that she had consented to the sexual acts she listed on the form. Under the section marked "assault history," T.G. indicated that she had been assaulted that day by defendant. In the section marked "methods employed by assailants," T.G. indicated that defendant had: (1) used a flashlight as a weapon during the sexual assault; (2) threatened to kill her; (3) punched and kicked her; (4) grabbed, held, and pinched her; (5) physically restrained her with tape; and (6) caused her injuries including a fat lip, a bruised left arm, a bruised right knee, a bruised left eye and overall body pain. In the section of the form marked "acts described by patient," T.G. responded that defendant had penetrated her vagina with his penis, his finger and a flashlight. She also stated that defendant had tried to penetrate her anus with the flashlight. T.G. responded that she had orally copulated defendant and he had ejaculated in her mouth.

Later in the evening, T.G. met for five hours with Susan Sixkiller, a victim advocate with the San Joaquin County District Attorney's Office. T.G. told Sixkiller that defendant had abducted her from the house the night before, thrown her into a car, and raped her. T.G. never stated or implied that the acts were committed with her consent. She also told Sixkiller that defendant had bound her with duct tape around her wrists, head and hair. T.G. described defendant as having a glazed-over, evil look in his eyes that she had never seen before.

Ten days after the incident, T.G. spoke with Deputy District Attorney Michael Mulvihill about the case. T.G. agreed to a taped interview although she was under no obligation to do so. T.G. told Mulvihill that defendant had started abusing her physically in March 1993, a month after they were married. At no time during the interview did T.G. tell Mulvihill that she had consented to any of the sexual acts that occurred on the morning of February 1, 2004.

*Defendant's Pretrial Statements*

After they returned from the hospital, Detectives Molthen and Rodriguez interviewed defendant at the police station. At the start of the interview, defendant told the detectives that they could ask him any question they wanted, but he was "not going to be very forthcoming." He admitted that he "flipped out" when T.G. asked him to leave the house and that he "did her wrong." However, defendant stated multiple times that it was unfair for her to kick him out of the house. Defendant indicated that he had wanted to resolve things with T.G. that night and "couldn't handle it" when she stopped answering the telephone.

Defendant stated that he would not talk about the specifics of what happened because he did not want "to put it together" for the police. Defendant told Molthen and Rodriguez that he "left a really wide trail" that night and admitted that he "was one hundred percent wrong." He continued, "[Y]ou guys got the story and anything I add to it is just going to screw me even more." Later, defendant added, "The whole picture is there, you know it as well as I do."

The detectives continued to question defendant about specifics. When Rodriguez suggested that defendant's silence about the details of what happened might cause people to think that he was trying to get away with his crimes, defendant responded that he would "be happy to corroborate [T.G.'s] deposition so that the kids [would not] have to participate." Defendant told Molthen and Rodriguez that "[T.G.] [was] an honest person . . . and uh . . . she gives it straight up."

Eventually, defendant described details of the events of the night before. He told the detectives about: (1) parking his car down the street from the house so that T.G. and the neighbors would not know he was there; (2) borrowing a screwdriver from a friend's house so that he could open the telephone box; (3) disconnecting the telephone and calling from a nearby pay phone to make sure the line was dead; (4) returning to the house and trying to break down the front door; (5) removing the screen and entering through a window on the side of the house; (6) screaming at T.G., saying "this is what [you] get;" (7) pushing T.G. around and hitting her in the bedroom; (8) dragging T.G. by her arm or hair into the garage; (9) tying her up; (10) forcing her to have sex and sticking the flashlight into her vagina; (11) threatening to cut off her body parts; (12) putting a gag in her mouth; (13) using the computer while T.G. lay facedown on the carpet; (14) putting T.G. facedown in the backseat of the car, hog-tying her, and driving away to get out of the county; and (15) having T.G. orally copulate him. At the end of the interview, defendant stated, "I've been honest with you, straight up." He was comfortable with the fact that he had corroborated T.G.'s description of what had happened.

*Defendant's Testimony*

At trial defendant testified that he never forced T.G. to have sex against her will. He explained that he and T.G. "had an agreement that [they] would try anything." According to defendant, they trusted each other not to hurt the other and if T.G. ever said "uh-uh" or "stop," defendant would immediately stop what he was doing. Defendant testified that the sex acts that occurred on February 1, 2004, were "the same sexual things" that they had "always done." He stated that he and T.G. often inserted objects into each other, took joy rides, had sex in different places, ripped clothes off each other, and had sex out in the warm sun. Defendant testified that they engaged in acts of bondage in the garage and the rope found in the Volvo was purchased for that purpose.

Defendant acknowledged that he was angry and yelled at T.G. when he found her trying to make a phone call from their bedroom early on the morning of February 1, 2004. He cried after striking her and they exchanged "forgiveness." Defendant testified that while he and T.G. were talking, she started touching him in a sexual manner. According to defendant, they went to the garage to engage in a typical sexual game. Defendant stated that T.G. did a striptease for him, and consented to being gagged and tied up. He maintained that she consented to the subsequent sexual acts and to leaving the house with him for a "joy ride."

When questioned about his statements to police, defendant testified that he "just told [the detectives] what they wanted to hear" because he was

frustrated, tired, hungry, and "just wanted it to be over." He denied coercing T.G. into testifying in a certain way.

*T.G.'s Testimony*

T.G. testified for the defense, stating that defendant did not force her to go anywhere with him, did not force her to have sex against her will, and did not threaten her in any way on February 1, 2004.

## DISCUSSION

## I.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V.

## Sufficiency of the Evidence to Support Burglary Conviction

Following the preliminary hearing, during trial, and in a motion for new trial, defendant unsuccessfully challenged the sufficiency of the evidence to support the burglary charge to go to the jury, and to sustain the conviction. The court ruled at the hearing on defendant's section 1118.1 motion that there was enough evidence to take the burglary count to the jury. The court explained: "[T]he issue is whether the defendant had an absolute and unconditional right to enter the residence. And it seems to the Court that it's apparent from the defendant's state of mind, from the victim's state of mind and the defendant's, that he did not have an absolute and unconditional right to enter the residence."

On appeal, defendant contends that a man who breaks into his family home after a marital fight is not guilty of residential burglary, and maintains that the court denied him his federal and state constitutional rights to due process and a fair trial by allowing him to be charged and convicted of a "non-offense." However, his argument focuses once again on the sufficiency of the evidence—that based on the facts of this case, he had a right to enter the residence. We conclude the jury properly convicted defendant of burglary.

█ Section 459 provides in pertinent part: "Every person who enters any house, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." The statute retains two important aspects of common law

---

*See footnote, *ante*, page 149.

burglary: "the entry must invade a possessory right in the building and it must be committed by one who has no right to be in the building. [Citation.] Because the crime of burglary requires the invasion of a possessory right in a building, one cannot be found guilty of burglarizing one's own residence." (*People v. Smith* (2006) 142 Cal.App.4th 923, 930 [48 Cal.Rptr.3d 378] (*Smith*), citing *People v. Gauze* (1975) 15 Cal.3d 709, 714 [125 Cal.Rptr. 773, 542 P.2d 1365] (*Gauze*).)

Defendant relies on *Gauze*, where the defendant had an argument with his roommate away from the apartment they shared, told the roommate to " 'Get your gun because I am going to get mine,' " returned to the apartment with a shotgun, and shot the roommate. (*Gauze, supra*, 15 Cal.3d at p. 711.) Gauze appealed his conviction of assault with a deadly weapon and burglary. (*Ibid.*) The Supreme Court reversed the burglary conviction, concluding that "defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation; only the entry of an intruder could have done so. More importantly, defendant had an absolute right to enter the apartment. . . . It was a personal right that could not be conditioned on the consent of defendant's roommates." (*Id.* at p. 714.) The Supreme Court observed that "[i]n contrast to the usual burglary situation, no danger arises from the mere entry of a person into his own home, no matter what his intent is. He may cause a great deal of mischief once inside. But no emotional distress is suffered, no panic in engendered, and no violence necessarily erupts merely because he walks into his house." (*Id.* at p. 715.)

Since the decision in *Gauze*, "courts have held that '[t]o sustain a burglary conviction, the People must prove that a defendant does not have an unconditional possessory right to enter his or her family residence. [Citation.]' [Citations.]" (*Smith, supra*, 142 Cal.App.4th at p. 930.) The *Gauze* court contributed to this area of law by clarifying its earlier decision in *People v. Sears* (1965) 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938] (*Sears*), overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 510, footnote 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].

Among other things, the defendant in *Sears* challenged a felony-murder instruction based on a burglary charge. (*Sears, supra*, 62 Cal.2d at pp. 739, 744.) The facts of that case were that three weeks before the incident giving rise to the criminal charges, the defendant and his wife separated and the defendant moved to a hotel. One evening the defendant returned to the residence with a friend, purportedly to pick up his mail. The defendant entered through the unlocked front door with a steel pipe hidden under his shirt. He hit his estranged wife with the pipe and killed his young stepdaughter when she tried to protect her mother. (*Id.* at pp. 740–741.) In *Sears*, the

Supreme Court reversed the conviction on grounds other than instructional error. However, it stated in dictum that the evidence supported a felony-murder burglary instruction, rejecting "defendant's contention that the court should not have given the burglary instruction because defendant, as Clara's husband, had a right to enter the family home. One who enters a room or building with the intent to commit a felony is guilty of burglary even though permission to enter has been extended to him personally or as a member of the public. [Citation.] The entry need not constitute a trespass. [Citations.] Moreover, *since defendant had moved out of the family home three weeks prior to the crime, he could claim no right to enter the residence of another without permission.* Even if we assume that defendant could properly enter the house for a lawful purpose [citation], such an entry still constitutes burglary if accomplished with the intent to commit a felonious assault within it." (*Id.* at p. 746, italics added.)

Ten years later in *Gauze*, the Supreme Court further explained its earlier opinion, observing that "Sears could be convicted of burglary . . . based on two separate considerations. First, *Sears had no right to enter his wife's house; that fact alone supported the conviction.* Second, even if he had a right to enter, the right was based on former section 157 of the Civil Code (now § 5102), which gave a person the right to enter the *separate* property of his or her spouse, subject to certain conditions. Thus *Sears' 'right' to enter his wife's house . . . was at best conditional. An entry for anything but a legal purpose was a breach of his wife's possessory rights . . . .*" (*Gauze, supra*, 15 Cal.3d at p. 715, some italics added.)

More recently, in *Smith*, the court upheld a burglary conviction over defendant's claim that he " 'should not be convicted of felony residential burglary for entering premises in which he own[ed] a co-equal interest.' " (*Smith, supra*, 142 Cal.App.4th at p. 929.) The defendant was arrested and jailed on October 3, 2000, after beating his wife. (*Id.* at pp. 926–927.) She obtained a restraining order and an order removing the defendant from the home and granting her sole possession. On October 10, 2000, after his release from jail, the defendant entered the home by throwing a propane canister through a glass door, and viciously attacked his wife. (*Id.* at p. 927.) The court rejected the defendant's argument that he had a right to enter the residence. Citing both *Gauze* and *Sears*, the court explained that "the court order which temporarily gave [defendant's wife] sole possession denied defendant an unconditional possessory right to enter [the] family residence." (*Id.* at p. 931.) It emphasized that "[t]he possessory right protected under the Family Code differs from that contemplated under the Penal Code. 'The possessory right protected by section 459 is the "right to exert control over property to the exclusion of others" or, stated differently, the "right to enter as the occupant of that structure." [Citation.]' [Citation.]" (*Id.* at p. 932.) The same principles apply to the facts in the case before us.

Although the aforementioned cases are factually dissimilar to this case in that T.G. did not have a court order granting her sole possession of the family home, was denied an emergency protective order, and defendant had only been out of the house for one day and evening, we believe the facts are within the principles enunciated in the *Sears* and *Smith* cases. Here, the evidence showed that T.G. asked defendant to leave the residence and he did so. Later that day, at T.G.'s request, Gantt delivered a suitcase and money to defendant. Gantt collected defendant's house keys from defendant without objection and returned them to T.G. By voluntarily leaving the house, giving up his house keys on January 31, 2004, and heeding the directives of T.G. to stay out of the family home, defendant waived his unconditional right to enter the home. By obtaining the house keys voluntarily from defendant, T.G. exerted possessory control over the family home to the exclusion of others, specifically defendant. (*Smith, supra,* 142 Cal.App.4th at p. 932.) Defendant's subsequent conduct demonstrated that he gave up his right to possessory interest in the house and understood he did not have the right to enter the residence at will. He parked his car on the public street in front of the house, and although he was upset, he did not attempt to enter or otherwise go inside the house. When the police arrived, defendant told them that while he thought it was unfair that he had to be the one to leave the home, he intended to wait in his car until T.G. let him back into the house. Although defendant was angry that he had been treated unfairly, he clearly knew that circumstances had changed.

■ Our conclusion that defendant was properly charged and convicted of burglary is consistent with the exception to the general rule, articulated in *Smith*, that a person cannot be convicted of burglarizing his or her own home. *Gauze* indicated that, under ordinary circumstances, "no danger arises from the mere entry of a person into his own home, no matter what his intent is. He may cause a great deal of mischief once inside. But no emotional distress is suffered, no panic in engendered, and no violence necessarily erupts merely because he walks into his house." (*Gauze, supra,* 15 Cal.3d at p. 715.) Here, as in *Smith*, the occupants of the family home were estranged, there had been prior threats to the safety of the victim and there had been incidents of spousal abuse. The victims feared for their safety. (*Smith, supra,* 142 Cal.App.4th at pp. 926–927.) It is clear in these circumstances that danger *did* arise from the mere entry of defendant into his former home.

## VI.

## Upper Term Sentence[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante,* page 149.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 30, 2008, S161189.