Filed 12/18/15  P. v. Harris CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062638 |
| v. | (Super.Ct.No. BLF1400195) |
| MICHAEL DESHAWN HARRIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

1

At trial, the prosecution presented evidence that defendant and appellant Michael Deshawn Harris broke into the apartment where his one-and-a-half-year-old daughter lived with her mother (the victim), physically abused the victim, and stole her money, keys, and cell phone. The jury convicted defendant of first degree burglary with another person present (Pen. Code, §§ 459, subd. (a), 667.5, subd. (c)(21), count 1),[1] infliction of corporal injury to the parent of his child (§ 273.5, count 2), and robbery (§ 211, count 3). Defendant was sentenced to 15 years in state prison.

On appeal, defendant contends there was insufficient evidence to support the burglary and robbery convictions. He argues his burglary conviction should be reversed because one cannot burglarize one's own home, and the evidence demonstrated he shared the apartment with the victim. He argues his robbery conviction should be reversed because the evidence showed he had a good faith belief the money he took from the victim belonged to him. Because we conclude the record contains substantial evidence to support both convictions, we affirm the judgment.

---

[1] All further unspecified statutory references are to the Penal Code.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Prosecution's Evidence*

Defendant and the victim have a one-and-a-half-year-old daughter together.  The victim and her daughter live together in a second-story apartment in Blythe.

On July 29, 2014, the victim got off work around 11:30 p.m.  She picked up defendant, who was at her apartment with the child, and they went to the grocery store and purchased a 30-pack of beer.  Over the course of the night they drank 24 of the 30 beers.  The next morning, the victim was unable to wake defendant.  She called her mother for help and they called an ambulance.

A Blythe police officer responded to the call and found defendant unconscious in a recliner chair.  The officer was able to wake defendant by applying pressure to his chest (a "sternum rub").  Defendant refused medical treatment from the paramedics.  The victim told the officer that defendant did not live at the apartment.  At her request, the officer asked defendant to leave.  Defendant left, taking a hamper full of clothes with him and commenting it was unfair he had to go.

About 15 to 30 minutes later, the victim's mother called the police about an incident that had just occurred at the victim's apartment.  When the officer returned to the apartment, the victim was there with her mother and appeared to be shaken and afraid. The victim told the officer that defendant had returned, broken into the apartment through

3

a window, and taken money from her. The officer observed the window in the master bedroom was broken and there was broken glass and fresh bloodstains inside the apartment. The victim had a cut inside her lip and her right cheek was swollen. She told the officer defendant had caused the injuries.

Later that morning, the victim went to the police station for a recorded interview. The prosecution played a video of the interview for the jury. The victim told the officer she had known defendant for about two years and had become pregnant shortly after she started dating him. They stayed together for about a year, but broke up around March 2013 because defendant "started getting on drugs real bad" and went to jail.

The victim was not currently dating defendant. He had been at her apartment on July 29 to pick up his clothes and to get a ride to his aunt's house, where he would be staying. Defendant had become angry and violent after they began drinking beer. He had yelled at the victim and thrown her against the wall. He had grabbed her genital area and accused her of sleeping with other men.

Eventually, defendant passed out in the victim's recliner chair and she went to her mother's house to get help. Her mother accompanied her back to her apartment and they called the police when they were unable to wake defendant. At that point, the victim was angry with defendant and just wanted him to leave.

Less than five minutes after defendant left, the victim was in her bedroom with her daughter and defendant broke and climbed through the bedroom window. The victim picked up her daughter and tried to call her mother for help. Defendant hit her across the face, causing her to drop the phone. Defendant picked up the phone and she ran into the hallway with her daughter. Defendant followed her, asking "Where's your fucking money at?" and threatening "I'll have a reason for you to call the cops now."

The victim did not want defendant to know her money was in their daughter's diaper bag, so she told him the money was in the living room. When defendant could not find the money he began hitting and kicking the victim. At this point, the victim was on her knees, holding their daughter and begging him to stop. Defendant kicked her again, across her head, and she told him her wallet was in the diaper bag. Defendant took about $260 from her wallet as well as her cell phone and keys, and climbed out of the apartment through the broken window.

The victim told the officer defendant had engaged in about four other incidents of domestic violence in the past. Once, he had grabbed her by her hair when she was sitting on her porch, dragged her into the kitchen, and beat her until she was unconscious. She said that the neighbors had seen defendant drag her off the porch. These violent incidents tended to happen when defendant was using drugs.

5

The officer testified that after he responded to the victim's apartment regarding the break-in, he had located defendant at another apartment about 50 yards away. Defendant was carrying the victim's cell phone and keys, and about $232 in cash. He denied having taken any money from the victim. He told the officer he had returned to the victim's apartment because he realized he had forgotten his bank card. The victim threatened him with "a big knife" and he had broken the window and injured himself while fleeing from her.

At trial, the victim recanted the statements she had given the officer after the incident, denying defendant had physically abused her or taken her money, and claiming he had been living with her at the apartment. She testified she had lied to the officer because she was upset with defendant at the time. She did not want defendant "to serve all these years" because her daughter would grow up without a father.

According to the victim's trial testimony, defendant had given her approximately $300 for rent shortly before the incident. He broke through the bedroom window and asked for his rent money back. At no point did he harm her. She let him take his money back and he left through the front door. She could not remember what caused the injuries to her face on the morning of the incident, but defendant had not caused them. She believed the injury to her lip was self-inflicted because she bit her lip when she was nervous.

6

The victim also testified that she and defendant were dating at the time of the incident and that they shared the keys to the apartment and the cell phone. Defendant was not named on the lease or the utility bills, but he gave her money for rent and utilities.

The victim testified that she and defendant did not discuss the case while he was in custody and that he had never told her how to testify. In response to this testimony, the prosecution played recordings of defendant's jailhouse phone calls to the jury. In a September 18, 2014 call, defendant tells a woman (likely his mother) that he needs to reach the victim to tell her what she needed to say to convince the district attorney or the judge to drop the charges. Defendant states, "she can get the DA to drop the charges, but she has to write a heartfelt letter sayin' look, he didn't take my money I lied about him takin' my money, I lied about him slappin' me, and as far as the window getting broke, yeah he broke the window but that was after I let him in the house."

That same day, defendant called the victim and told her she was the only one who "can get this off me." He told her she needed to show he lived in the apartment and had not entered through the window. He told her to talk to the district attorney, but to be careful what she said because during his arraignment she had already said "two outta three things . . . you were not supposed to say."

Defendant also told the victim "I know this:  That you can—you can tell 'em whatever you wanna tell 'em and nothing's gonna happen to you."  At one point during the call, defendant became angry with the victim because he thought she was not paying close attention to him, and he asked her "Why can't I just tell you what to fuckin' say and you're tellin' me you know what to say?  Do you really know what to say to save my fuckin' life, dude?"  Defendant told her to say she had asked him to come back to the apartment and had opened the door for him.  He told her to say the money he took from her wallet belonged to him.

The following day, the defendant called the victim and urged her to write to the judge or talk to the district attorney and tell them she did not want to go to trial.  Defendant said he was going to marry her when he got out of jail, and talked about having another child with her.

During his examination, the officer testified that "every time" he had been to the victim's apartment prior to the incident, she had told him defendant did not live at her apartment.  He recalled one occasion, several months before the incident, where defendant was on the victim's balcony, "unwelcome," and she had reported defendant did not live with her.

B.    *Defense Evidence*

Defendant's probation officer testified that in June 2014, he had provided her with the victim's address as his residential address.  When the probation officer had made an

8

unannounced home visit to the victim's apartment on July 28, 2014, both defendant and the victim were home.

## II

## DISCUSSION

A.       *Substantial Evidence Supports the Burglary Conviction*

When a defendant challenges the sufficiency of the evidence supporting a conviction, we review the entire record in the light most favorable to the judgment to determine whether it discloses sufficient evidence—evidence that is reasonable, credible, and of solid value—to support the decision.  (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)  "We neither reweigh the evidence nor reevaluate the credibility of witnesses." (*Ibid.*)

Defendant argues that his burglary conviction must be reversed because there was insufficient evidence to support a finding that his entry of the apartment was unlawful. He asserts the evidence demonstrates the apartment was his home.  We disagree.

Burglary contains two basic elements:  an unlawful entry of any building accompanied by an intent to commit a grand or petty larceny or any felony.  (§ 459; *People v. Smith* (2006) 142 Cal.App.4th 923, 929 (*Smith*).)  However, "[b]ecause the crime of burglary requires the invasion of a possessory right in a building," the entry " 'must invade a possessory right in the building and it must be committed by one who has no right to be in the building.' "  (*Smith*, *supra*, at p. 930, quoting *People v. Gauze*

9

(1975) 15 Cal.3d 709, 714.) Thus, in cases where the building is one's own residence, "[t]o sustain a burglary conviction, the People must prove that a defendant does not have an unconditional possessory right to enter his or her family residence." (*Smith*, *supra*, at p. 930.)

The case of *People v. Gill* (2008) 159 Cal.App.4th 149 (*Gill*) is instructive here. In *Gill*, the defendant's wife had asked him to leave the family residence because of marital issues, and the defendant did so. (*Id.* at p. 161.) Later that day, the defendant gave his house keys to a neighbor who was delivering a suitcase to him. (*Ibid.*) The next day, the defendant returned to the family residence and sexually assaulted and kidnapped his wife. (*Id.* at pp. 152-154.) The court upheld the burglary conviction, holding that the wife had "exerted possessory control over the family home to the exclusion of . . . defendant" and that the defendant had "waived his unconditional right to enter the home" by leaving the house voluntarily and giving up his house keys to his neighbor. (*Id.* at p. 161.)

Similarly here, the record supports a finding that the victim had exerted possessory control over the apartment by asking defendant to leave and that defendant had waived his unconditional right to enter the apartment by leaving voluntarily. The officer testified that the victim had told him she no longer wanted defendant in her apartment and that she had asked him to ask defendant to leave. The officer also testified that defendant left when asked. These facts alone support a finding that when defendant broke through the

10

bedroom window minutes later, he had no right to be there because the victim had exerted possessory control over the apartment and defendant had waived his right to enter the home. (*Gill*, *supra*, 159 Cal.App.4th at p. 161; see also *Smith*, *supra*, 142 Cal.App.4th at p. 930.)

Moreover, this analysis assumes defendant actually had a possessory right to the apartment when the officer asked him to leave. This is a generous assumption because there is also evidence in the record supporting a finding that any possessory right to the apartment defendant may have had was revoked long before the incident. On the morning of the incident, the victim told the officer that defendant did not live at the apartment, that his name was not on the lease, and that they had not been dating for over a year. She told the officer the only reason defendant had been at her house the night before was to pick up his clothes before she drove him to his aunt's house. Based on these statements, the jury could have reasonably found that *at no point* on the day of the incident did defendant have a possessory right to the apartment.

Defendant contends the evidence demonstrated that he shared the apartment with the victim. Specifically, he points to the victim's trial testimony that he lived at the apartment with her and helped pay for rent and utilities. He also points to the probation officer's testimony that he had used the apartment as his home address and had been there when the probation officer arrived for the unannounced home visit. Defendant misunderstands the substantial evidence standard of review. Reversal is not warranted

11

merely because the record contains evidence that might support a finding contrary to guilt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) Reversal is only warranted where it clearly appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 329.) We find the record contains ample evidence to support a finding that defendant had no right to be in the apartment when he broke through the window.

        B.      *Substantial Evidence Supports the Robbery Conviction*

Next, defendant argues there was insufficient evidence to support a finding that he had the specific intent to commit robbery because the evidence showed he held a good faith belief the money, cell phone, and keys belonged to him. We disagree with this contention as well.

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938.) The claim-of-right defense does not apply if the defendant attempted to conceal the taking after the taking was discovered. (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 643-644 ["A lack of concealment is evidence that a defendant has a good faith belief in his or her right to the property at issue"].)

12

Here, the officer testified that when he interviewed defendant after the incident, defendant denied having taken any money from the victim. Defendant told the officer he had gone back to the apartment to get his bank card and to ask the victim for money, even though he knew she would not be willing to give him money. This, coupled with the victim's statement to the officer that defendant had broken into her apartment and asked her "Where's your fucking money at?," reasonably supports a finding that defendant knew the money he took was the victim's and had tried to conceal that fact during the police interview. Defendant again points to evidence supporting a finding that he believed the items he took were his. However, the victim told the officer on the day of the incident that the money, keys, and cell phone belonged to her, and the jury was free to find these statements more credible than the victim's trial testimony.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

KING
P. J.

MILLER
J.

13