Filed 2/10/15  P. v. Wheeler CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARNELL WEBSTER WHEELER,<br><br>    Defendant and Appellant. | F066696<br><br>(Fresno Super. Ct. No. F08901838)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Darnell Webster Wheeler was charged with multiple offenses based on a series of domestic violence and stalking incidents he committed against his

estranged wife. He was convicted of first degree residential burglary, based upon his entry of a home which he owned and treated as a rental property, and where his estranged wife was living as a tenant (Pen. Code,[1] §§ 459, 460, subd. (a)); felony stalking of his estranged wife committed during a five-month period (§ 646.9, subd. (a)); and misdemeanor disobeying a domestic relations court order (§ 273.6, subd. (a)); with six prior strike convictions and one prior serious felony enhancement. He was sentenced to two consecutive third strike terms of 25 years to life, for a total of 50 years to life plus five years for the prior serious felony enhancement.

On appeal, defendant argues his conviction for residential burglary must be reversed because he owned the house that he broke into; he had an unconditional possessory right to enter even though his estranged wife was living there; and the jury was not properly instructed on the elements of the offense. He also contends the court improperly imposed consecutive sentences for burglary and stalking in violation of section 654. Finally, he argues the court erroneously calculated his presentence credits. We will order the correction of his presentence credits and otherwise affirm.

## FACTS

Defendant and Clezel Sewell met in high school in Fresno and periodically kept in touch in the following years. Sewell became a school counselor and lived in Fontana with her teenage daughter.

In 1993 and 1994, defendant was convicted of criminal threats (§ 422); kidnapping (§ 207); and felony and misdemeanor corporal injury to a spouse (§ 273.5, subd. (a)). The victim was his former wife.[2]

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] According to the probation report, defendant's prior convictions, which were alleged as the strikes in this case, were from three separate incidents in 1992 and 1993, where defendant kidnapped, sexually assaulted, and repeatedly threatened his previous

2.

By 2006, defendant had been released from prison and he lived in Fresno. He was on parole and had to wear an electronic monitor. During that time, he contacted Sewell in Fontana, and they renewed their friendship.

Defendant gave Sewell a pink cell phone so he could pay for their long distance calls. He told her to give up her personal cell phone. Sewell accepted the pink cell phone, but she also kept her personal cell phone and continued to use it for other matters. Defendant had the contract and paid the bills for the pink cell phone.[3]

Sewell testified that soon after she started dating defendant, she learned about his felony convictions and prison record. They talked about what happened, and she decided she was not afraid of defendant and continued their relationship.

Early in 2007, defendant proposed to Sewell, and she agreed to marry him. Defendant still lived in Fresno. Sewell planned to stay in Fontana until she finished the school year, and then she would join defendant and move to Fresno. Sewell testified they also decided she would take a year off from her career and help defendant with his various hauling and construction businesses.

**The DeYoung and Ellery Homes**

When they started dating, defendant owned and was living in a house on DeYoung Drive (the "DeYoung home") in Fresno. In January 2007, after they were engaged but prior to their marriage, defendant purchased a larger home on Ellery Way (the "Ellery home"). Sewell was not living with defendant when he bought and furnished the Ellery home and testified that she did not know he was going to spend that much money on

---

wife after their separation. He was sentenced to 21 years and four months in prison. He was released on parole in 2005.

[3] As we will explain below, defendant later took the pink cell phone away from Sewell, and it was subsequently found attached to the undercarriage of her car. A prosecution expert testified defendant could have used the cell phone to track Sewell.

another house.  Defendant told Sewell that he wanted them to live in the Ellery home after their marriage.

On March 31, 2007, defendant and Sewell were married.  Sewell and her daughter remained in Fontana so she could finish her teaching contract.  Defendant moved into the Ellery home, but he still owned the DeYoung home.  Sewell testified defendant said there were renters living in the DeYoung home.  At trial, defendant also testified he had "several different renters" living in the DeYoung home after he moved out.[4]

## Sewell Moves to Fresno

On August 1, 2007, Sewell and her daughter moved from Fontana and lived in the Ellery home in Fresno with defendant.  Sewell testified that defendant's teenage daughter and niece also lived with them.  Sewell testified defendant said he could track his daughter using her cell phone, and "he wanted me to switch my daughter's service over, because she was the only one in the household that wasn't using the same type of plan, so we could track her, but I never did switch her phone number."

## Sewell Moves to the DeYoung Home

Shortly after she moved to Fresno, Sewell's relationship with defendant started to deteriorate because of personal problems and family tensions that were not apparent while they were dating.  Sewell tried to talk to defendant about their problems, but things did not change.

By the end of August 2007, Sewell decided to separate from defendant and move out of the Ellery home.  She asked defendant if she could move into the DeYoung home.

---

[4] As we will discuss below, defendant and Sewell lived in the Ellery home once she moved to Fresno.  After their separation, defendant remained in the Ellery home. Sewell moved into the DeYoung home, lived there without defendant, changed the locks, and obtained a restraining order against him.  Defendant was convicted of burglarizing the DeYoung home when he hired a locksmith to open the residence while Sewell was not home, and he was found hiding in a closet.  In issues I and II, *post*, we will address his contentions that he could not be convicted of burglarizing a home which he owned.

4.

Sewell testified that defendant refused, and said she should "leave period" and return to Fontana if she was not going to help with his businesses. Sewell testified defendant said "that I wasn't going to stay here and nothing happen to me." Sewell did not take his statement seriously.

Sewell testified that during their relationship, she had loaned "a great sum of money" to defendant for his businesses: $30,000 in cash, written on personal checks from her bank account; and $10,000 on her credit card. He had not repaid the money when they separated.

Sewell testified defendant eventually agreed she could move into the DeYoung home upon their separation. Defendant said he would deduct the monthly rent for the DeYoung home from the large debt he owed Sewell. Sewell separately paid for the utilities.

On September 1, 2007, Sewell and her daughter moved from the Ellery home into the DeYoung home. Her uncle, Albert Willis, lived in the DeYoung home with them. Defendant continued to live in the Ellery home.

**Initial Incidents at the DeYoung Home**

After she moved into the DeYoung home, defendant and Sewell attended some counseling sessions, went on a few dates, and tried to reconcile. However, defendant acted "volatile … one minute you need to go back to Fontana, one minute let's try to work it out, one minute you need to come back to the Ellery place to help me with these bills. It was just sporadic and all over the place." Sewell became afraid of defendant because his actions were "kind of like night and day." Sometimes he would be nice to her, but other times they argued, and he left angry messages for her. On some occasions, she would be shopping and suddenly defendant would appear at the same place.

One evening in October or November 2007, Sewell was at the DeYoung home and talked to defendant on the telephone. They argued and she hung up. After the call, she went to bed and woke up to find defendant sitting on her bed looking at her.

On January 1, 2008, Sewell cut off dating and any form of intimacy with defendant because she was frightened by these incidents, and she realized they did not have a relationship anymore.

On or about January 7, 2008, Sewell visited the Ellery home to do laundry, and spent the night there. She did not have intimate contact with defendant that night. When she got up the next morning, defendant had already left. Sewell went outside and discovered her car had been vandalized while it was parked in the driveway. She reported the damage to the police and suspected defendant was responsible.

**The January 17, 2008, Incident at the DeYoung home[5]**

Around 8:00 a.m. on January 17, 2008, Sewell drove into the garage of the DeYoung home after taking her daughter to school. As the outer garage door was closing, defendant drove a pickup truck under the door to block it.

Sewell testified she stayed inside her car. Defendant walked up to her car and yelled at her. Sewell closed the car window and told defendant she was going to call the police if he did not leave. Sewell repeatedly honked her car horn and hoped the neighbors would hear. Defendant finally walked out of the garage and backed his truck into the street. Sewell testified she did not call the police because she just wanted him to leave.

Sewell closed the outer garage door. She went inside the house using the door between the garage and the kitchen. Sewell started to get ready for a job interview. Defendant called the house telephone and left a message that he dropped his wallet in the

---

[5] Defendant was charged with count I, false imprisonment by violence, based on the January 17, 2008, incident at the DeYoung home. He was found not guilty of the charged offense and the lesser included offenses of attempted false imprisonment and misdemeanor false imprisonment. However, we will recount Sewell's testimony about this incident because it is relevant to defendant's subsequent conduct and his stalking conviction.

garage. Sewell did not answer the call, but she went back to the garage to look for the wallet.

As Sewell entered the garage, her burglar alarm sounded and she discovered defendant was in the garage. Defendant forced his way from the garage into the kitchen. He yelled at Sewell to "shut the F'ing alarm off." Sewell testified that she initially did not take defendant's actions seriously.

Sewell testified she was holding both her personal cell phone and the pink cell phone that defendant had given her. Defendant started "tussling" with her and took back the pink cell phone, but Sewell held onto her personal cell phone.[6]

At some point during this incident, Sewell's personal cell phone was activated and part of her encounter with defendant was recorded on her cell phone.

Sewell testified defendant accused her of talking to a former boyfriend and said he was "tracking" her and had "messages." Sewell tried to escape from the house, but defendant stopped her from leaving. Sewell ran to the front door, but defendant pushed her on the sofa. Defendant sat on top of her so that she could not move.[7] Sewell was crying and afraid, and felt "like I was going to die." She told defendant to "go ahead and kill me. I will be dead anyway. I had just given up."

Sewell testified defendant said: "I brought you to Fresno for me. I don't want to see you with anyone else. And you need to go back to Fontana. Don't think you are going to stay in Fresno and nothing happens to you." Defendant also said: "I know

---

[6] As we will discuss below, two months after this incident, the pink cell phone was found attached under the frame of Sewell's car, and a prosecution witness testified it would have been possible for defendant to track the movements of the vehicle. There was conflicting evidence as to how long the cell phone's battery would have lasted without being charged.

[7] Sewell testified she weighed 130 to 140 pounds, and defendant weighed 210 pounds.

7.

everything you got to do (unintelligible)," and that she had a job interview that day. Sewell had been concerned that defendant was watching her, and now she realized he was.

Sewell yelled at defendant "something like now I believe what you did to your ex-wife is true," referring to his prior convictions for kidnapping and rape. Defendant looked at her with "glazed eyes" and said, "I'm not raping you." Defendant finally left when Sewell's telephone rang.

Sewell called 911 and reported the incident. At 8:30 a.m., Officer David Griffin responded to the DeYoung home. Griffin testified Sewell was calm, coherent, and very upset. She did not have any visible injuries. Sewell played the cell phone recording of what happened, and Griffin testified most of the tape was inaudible.

**The Temporary Restraining Order**

On January 18, 2008, the day after this incident, Sewell applied for a temporary restraining order against defendant. She changed the locks on the DeYoung home and filed for divorce.

Sewell also reported the assault to Agent Andrew Mounts, defendant's parole officer, and played the cell phone recording for him. Sewell told Mounts she was afraid defendant was going to kill her. Mounts told Sewell she was not in danger, and defendant would not hurt her.

On January 21, 2008, the court issued a temporary restraining order on Sewell's motion, that defendant could not "harass, attack, strike, threaten, assault, sexually or otherwise, hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance or block movements" of Sewell, her daughter, and her uncle; and that he had to stay at least 100 yards away from them and their cars. On January 25, 2008, the order was served on a man at the Ellery home who identified himself as defendant. The order was valid until February 6, 2008.

Shortly after the court issued the restraining order, Sewell received numerous telephone calls on her personal cell phone from a blocked number that she did not answer. The caller occasionally left messages filled with profanities, warning her to be careful because "what you say may be heard or something to that effect." She believed defendant made the calls, but she did not know for sure.

## Defendant's Burglary of the DeYoung Home [Count III]

As of January 26, 2008, Sewell continued to live in the DeYoung home with her daughter and her uncle, Alfred Willis. Defendant was living in the Ellery home, he was subject to the restraining order, and his parole officer had instructed him to stay away from the DeYoung home. Willis had been working for defendant, but defendant had fired him.

Around 8:00 p.m., Sewell and Willis left the DeYoung home and drove to the movie theater at the River Park Shopping Center. Sewell's daughter was out of town. Willis testified he never saw defendant at the shopping center. Willis went into the theater before Sewell.

Sewell stayed outside the theater and called a friend. She suddenly saw defendant less than 100 feet away from her. He was dressed completely in black, he was "leering" and "staring … with this evil look, looked like he was going to attack me or something."

Sewell walked around the shopping center. Defendant followed and stared at her. Sewell testified there were a lot of people around, and she did not think he would do anything in front of them. Sewell went into the theater. Defendant did not follow her.

While Sewell was in the theater, defendant drove to the DeYoung home. He called Larry Lopez, a mobile locksmith. Lopez testified defendant said he was locked out of his house and gave him directions to the DeYoung home.

Around 10:15 p.m., Lopez arrived at the DeYoung home and met defendant outside. Defendant asked him to unlock the door. Lopez asked for identification and

9.

defendant proved the house belonged to him. Lopez used his tools and opened the front door, which might have made it difficult to use the same key again.

Lopez testified defendant went inside the house, and then he returned outside and paid him. Lopez testified defendant was in a hurry and wanted him to leave. Defendant signed Lopez's paperwork, but he refused to fill out the service tag and did not want a receipt. He told Lopez to leave before his wife returned. According to Lopez, defendant said: "My wife's out with the girls. I'm supposed to stay home. I didn't, so that's why I'm back home and I need you to leave before she pulls up. She's going to pull up any second and you're going to be busted, so he didn't take the tag or anything and I left right after I let him in."

Sewell and Willis left the theater. They did not see defendant in the shopping center. Sewell drove back to the DeYoung home and parked in the garage. Willis went to the front door to unlock it, but his key would not open the lock.

Sewell called 911 because she was afraid defendant had done something to the lock, and she did not want to go into the house. Sewell stayed outside and waited for the police.

Willis went into the garage and opened the door into the kitchen. He walked into the house and started looking for bugs or cameras because it "seemed like everywhere we was [*sic*] going or [Sewell] and her friends be going they always said they saw [defendant]."

Willis noticed the light was shining under the door to the closet under the stairs. He walked to the door and heard some noise inside the closet, "like some breathing." Willis opened the door and walked into the closet. He had to "squat down" because of the low ceiling.

Willis testified he walked to the back of the closet and found defendant stooped down in the corner. Willis immediately told defendant to leave because Sewell was calling the police. Defendant left through the front door.

10.

Sewell testified she was standing in front of the house when she heard Willis call out for her. Sewell went into the garage, and Willis told her that defendant was in the house. Sewell was frightened and ran back to the street. She called the police again. Sewell testified defendant emerged from the front door and ran down the street. Defendant was wearing the same black clothing that Sewell had seen at the theater.

At 10:32 p.m., an officer responded to the DeYoung home and spoke to Sewell. She was scared, shaking, and terrified. Sewell and Willis reported what happened that night.

Based on their reports, the officer arranged for another unit to look for defendant at his residence on Ellery. The officer also contacted Agent Mounts and placed a parole hold on defendant.

At 10:57 p.m., two officers arrived at the Ellery home to look for defendant. The house was dark. They repeatedly knocked and stayed there for 40 minutes, but no one answered the door or returned to the house. They rescinded the parole hold.[8]

As a result of this incident, Sewell arranged to immediately move out of the DeYoung home because she feared for her life. The next day, she moved her family into a gated apartment complex in Clovis.

On the next business day, Sewell went to the parole office and asked to speak to Agent Mounts's supervisor. She spoke to Agent Sims and reported that defendant had

_____

[8] As we will explain, *post*, defendant admitted at trial that he hired the locksmith and entered the DeYoung home, but claimed he just wanted to retrieve his mail, and he was in the closet to look through some DVDs. Defendant also admitted he removed his electronic monitor before he went to the DeYoung home, and that two friends provided alibis on his behalf and claimed he was at the Ellery home all night. Agent Hagler, who was with Agent Mounts that night, testified the police called Mounts and reported the incident, Mounts checked defendant's electronic monitor and determined he was at the Ellery home all night, and Mounts called defendant and advised him not to leave his house or he would be arrested. Hagler testified he disapproved of Mounts's call to defendant and would have advised the police to place him in custody as a precaution.

11.

been hiding in the house, and played the cell phone recording from the January 17, 2008, incident.

Sewell testified that shortly after this incident, defendant's car would be parked at the same place where she was, and he continued to call her. Sewell did not report every incident because she was "definitely" not being helped from anyone in law enforcement. Sewell applied for a permanent restraining order.

**The Permanent Restraining Order and Sewell's New Job**

On February 6, 2008, the court granted Sewell's motion for a permanent restraining order against defendant, to stay 100 yards away and not to contact, harass, or stalk her. The motion was effective until 2013. On February 15, 2008, defendant was served with the five-year restraining order.

At some point in February 2008, defendant was taken into custody for a possible parole violation, based on Sewell's allegations that he followed her at the shopping center and he broke into the DeYoung home on January 26, 2008. As we will discuss, *post*, defendant and two friends testified at the parole hearing that he was at the Ellery home that night and never left. Defendant was not found in violation of parole, and he was released from custody. During this trial, however, defendant admitted he lied at the parole hearing about his whereabouts, and that he hired the locksmith and entered the DeYoung home that night.

Also in February 2008, Sewell was hired as an assistant principal at a high school in Fresno. Her principal described her as an excellent employee. Shortly after beginning her new job, however, her coworkers started to receive e-mails and social media posts that were extremely disparaging to Sewell's character. Sewell suspected defendant and/or his family were responsible for these disparaging messages.[9] Sewell also believed

---

[9] A detective later traced one of the disparaging e-mails to an account registered to the daughter of defendant's sister, Sharlene Dillard. Dillard and her daughter, Kalea Turner, (defendant's sister and niece) testified as defense witnesses, and admitted they

12.

defendant was following her because he was "starting to show up" when she was driving down the street.

In March 2008, Sewell spoke to her principal and explained her concerns about defendant, that she believed he was stalking her, she feared for her life, and he was likely responsible for the disparaging social media and e-mail messages about her. She gave copies of the posts to the principal, who passed them along to the school district's investigating agency. Defendant's photograph was distributed to the school's security officers, but he was never seen on campus.

**The Incident at Epperson's House**

On March 5, 2008, defendant was discharged from parole, having never been found in violation from any of Sewell's complaints about him to the police.

On the evening of March 8, 2008, Sewell supervised a high school dance. During the event, she received a telephone call from defendant's sister, Sharlene Dillard, who yelled profanities and threatened her.

After Sewell finished working at the dance, she picked up Tamara Epperson and they went to the Smokehouse, a restaurant/bar in downtown Fresno. Sewell and Epperson had recently met. Epperson knew Sewell had been married, but she did not know defendant.

Around 2:00 a.m., Sewell and Epperson left the restaurant. As Sewell drove to Epperson's home, she saw defendant's truck parked at the entrance to Epperson's street. Defendant was in the truck, and he made eye contact with Sewell. Sewell was afraid because he was violating the restraining order. She told Epperson to call 911. Defendant drove away. Sewell followed defendant's truck.

---

were responsible for the disparaging e-mail messages and social media posts about Sewell. They testified defendant did not know or ask them to post the messages, and they did it on their own because they did not like Sewell.

13.

Epperson testified Sewell was "freaking out." Epperson called 911 and repeated what Sewell told her – that defendant was there, and they were following his truck. Epperson was frightened.

Sewell testified she lost defendant in traffic and drove back to Epperson's house. Sewell called 911 and reported defendant was following her; she was afraid defendant was going to kill her, and no one would believe her. The police responded to Epperson's house, took a statement from both women, and determined there was a valid restraining order against defendant.

Later that evening, two officers went to defendant's house on Ellery. The house was dark, no one answered the door, and they left after 10 minutes.

A few days after this incident, Epperson received a call on her home telephone from a blocked number. A man said in a threatening voice to "quit playing on the phone, I'm going to kill you and then the 'B' word." Epperson later received a telephone message from a woman who identified herself as defendant's sister, Sharlene, who said "she was going to kick my ass and to quit messing with her brother."

**Sewell Meets with a Detective**

On March 10, 2008, Sewell went to the police department and met with Detective Michael Agnew, who reviewed a chronology of her calls to the police about defendant. Sewell told him about the disparaging social media posts, the threatening voicemail messages, and the cell phone recording of the January 17, 2008, incident at the DeYoung home, when defendant sat on her. Detective Agnew testified Sewell was very frustrated that law enforcement had not helped her or stopped defendant.

14.

## The Taser Incident at the Patterson Building

On March 12, 2008, Sewell met with her attorney at the Patterson Building in Fresno.[10] After the meeting, she walked out of the building and headed to her car. Defendant suddenly appeared from behind her vehicle. Sewell immediately called 911 to report another violation of the restraining order. The dispatcher said someone would respond right away.

Sewell waited on the street for the police. Defendant walked within an arm's length of her. He "leered" at her, gave her an "evil look," and walked into the building. About five minutes later, defendant walked out of the building and came within an arm's length of Sewell. Sewell again called 911. Sewell testified defendant glared, suddenly lunged toward her, and mouthed the words, " 'I'm going to kill you.' "

Sewell testified she "just lost it" and was terrified. She feared defendant was going to kill her. Sewell had purchased a Taser to protect herself because of the prior incidents with defendant. She thought if she shot defendant with the Taser, it would hold him in place until the police arrived, and she would have proof that he was following her.

Sewell pulled the Taser out of her purse, fired it at defendant, and missed him. Defendant ran away, and Sewell followed because she was upset, scared, and despondent. "It had been months and months of harassment and stalking. I was fed up and tired." Sewell testified the police finally arrived as she was chasing defendant. She stopped and waved her arms to flag them down.

The officers testified Sewell reported defendant violated the restraining order. Sewell told the officers she fired the Taser at defendant because she was afraid he was going to kill her. The officers spoke to defendant, who said he had an appointment with

---

[10] Kojo Moore, Sewell's attorney, confirmed Sewell had this appointment with his office for "a while" before this incident.

15.

his own lawyer in the building. Defendant declared he had placed Sewell under citizen's arrest because she tried to shoot him with the Taser.

Sewell testified the police placed her in the patrol car. Agent Mounts arrived, even though defendant had been discharged from parole. Sewell remained in the patrol car, but defendant was laughing and talking with the officers. The officers gave Sewell a citation and, at defendant's request, served her with a temporary restraining order to stay away from him.

**Discovery of the Pink Cell Phone under Sewell's Vehicle**

The day after the incident at the Patterson Building, Sewell spoke with her principal and advised him about her encounter with defendant. Sewell testified that defendant had sent someone to the high school, who left a copy of the police citation at the principal's office.[11] Sewell was extremely fearful for her life.

Sewell told the principal that she was afraid defendant had placed some type of tracking device on her Mercedes SUV. The principal encouraged her to take the car to the Mercedes dealership to have it inspected. She was afraid because defendant's cousin worked at the dealership. The principal told Sewell to take the car to another dealership where he knew people.

On March 13, 2008, Sewell took her Mercedes to the Saturn dealership for an inspection. A mechanic looked under the car frame and immediately found a cell phone under the front left side of Sewell's car. The cell phone had been attached to the vehicle's undercarriage with plastic zipties and a magnet. Sewell realized it was the pink

---

[11] Webster Wheeler, defendant's father, testified he went to the high school after the Patterson Building incident because he wanted to speak to the principal or vice principal about Sewell's conduct. They were too busy, so he left documents to advise them that Sewell chased defendant with the Taser and received a police citation. He claimed defendant did not tell him to do that.

16.

cell phone that defendant had given to her when they were dating, and took away from her during the first confrontation at the DeYoung home.[12]

Detective Agnew responded to the dealership in response to calls from both Sewell and the school district's investigator. He observed the cell phone attached under the car. (RT 2795-2798, 2806) There were no fingerprints found on it.

## The Assault on Sewell at the Apartment Garage

On March 15, 2008, Sewell, her daughter, and Willis were living in the gated apartment complex in Clovis. Sewell went to dinner with a friend that evening. Around 6:00 p.m., Mark Kendig, another resident of the apartment complex, noticed an African-American man standing near the garbage dumpster area. The man was wearing a hooded sweatshirt. Kendig had never seen him before, but thought he was related to Sewell because she was the only African-American living in the apartment complex.

Around 10:00 p.m., Sewell drove back to her apartment, entered the security gate, and parked in her assigned garage. As she got out of the car, she heard footsteps behind her. She turned around and defendant was there.

Sewell testified defendant "slammed" her face and "pounded" her with his fist. Sewell fell backwards and her head hit the concrete. Sewell was screaming, and she tried to discharge her pepper spray canister, but it did not work.

Sewell testified defendant sat on her stomach and kept "pounding" her in the head. Sewell tried to fight back. Defendant punched her face, ears and head. Sewell kept screaming and defendant put his fist against her mouth. His fist blocked her breathing for less than a minute and then he removed it.

---

[12] At trial, defendant and his daughter claimed the pink cell phone disappeared from the Ellery home when defendant was taken into custody for the parole violation hearing, and that Sewell purportedly attached the pink cell phone to her own vehicle.

17.

Willis and her daughter were in their apartment. They heard Sewell's screams and ran to the garage. They saw defendant sitting on top of Sewell, straddling her body and beating her in the head. Defendant was dressed in black with a black beanie and dark hoodie. Defendant pinned down Sewell's legs so she could not kick or resist. Her daughter testified defendant punched Sewell in the head at least 10 times. Defendant kept beating her until he heard her daughter's screams. He looked at her daughter, and then he got up and ran away toward the gate.

Willis and Sewell's daughter initially ran after defendant, but realized that was not a smart thing to do and returned to the garage. Sewell's daughter called 911 and reported that her stepfather (defendant) had just attacked her mother, and beat her with a closed fist. Her daughter said she saw the beating as it happened, that defendant ran away, and that her mother was bleeding from the mouth and needed an ambulance. Her daughter said defendant was wearing black clothes and a black beanie.

Kendig, Sewell's neighbor, testified he heard Sewell's screams and ran outside. He saw the same man who had been standing by the garage dumpster. The man was running away, and he was being pursued by another man, later identified as Willis.

**Investigation of the Assault**

At 10:36 p.m., Clovis Police Officer Drew Mosher responded to the apartment complex. Sewell was lying in Willis's arms. Mosher testified Sewell's face was "really, really badly swollen to the extent that her left eye, she couldn't even open it and her mouth was bleeding." Sewell's daughter was crying and very upset. Willis was frustrated and angry about what happened.

Officer Mosher spoke separately to Willis, Sewell, and her daughter. Based on their statements, he dispatched officers to look for defendant as the suspect. The police could not find defendant that night.[13]

Officer Mosher testified Sewell had a "very unique demeanor, one that I probably hadn't seen until then and probably haven't seen since then in twenty years of emergency services."

> "She was crying and frightened but as I spoke with her and she described the ongoing problems that she had been having in her pending divorce, I got the sense that she was losing hope, that nobody had been able to protect her and that this divorce, she wasn't going to survive the divorce and she was kind of coming to grips with that is kind of how I sensed her demeanor."

## Sewell's Injuries

Sewell was taken to the hospital for treatment of her injuries. She had knots and bruises all over her face, eyes, lips, and head, and a cut under her tongue. Her left eye was swollen shut and remained closed for about a week until the swelling went down. Her right ear was split open and stapled back together.

Later that night, Officer Mosher arranged for the police chaplain to take Sewell and her daughter to a hotel for their safety. They later moved to a safe house and stayed there for several weeks.[14]

---

[13] Defendant was arrested a few days later. He was in custody for three days and was then released on bail. Defendant was later returned to custody and remained so during the trial. At a pretrial bail hearing, defense counsel stated that defendant had "already finished one year at San Joaquin Law School" when he was arrested in this case.

[14] Based on the assault in the garage, defendant was charged with count IV, corporal injury to a spouse. The jury was unable to reach a verdict on this charge and a mistrial was declared. However, defendant was charged and convicted of count V, misdemeanor disobeying a domestic relations order on the same day.

**Defendant Allegedly Calls Sewell's Cell Phone**

On March 20, 2008, defendant appeared in court and was served with a criminal protective order to have no contact, directly or indirectly, with Sewell, including by a telephone call.

On March 27, 2008, Sewell was being interviewed at the district attorney's office about this case by a deputy district attorney and an investigator. During the interview, Sewell received a call on her personal cell phone and recognized defendant's number. Sewell became frantic and did not answer the call.[15]

On May 7, 2008, Sewell received a call from an unknown number and did not answer. The caller left a message: "F'ing idiot." Sewell testified the caller's voice sounded like defendant. This occurred the day before Sewell was scheduled to appear in court on the school district's motion to obtain a restraining order to keep defendant away from the high school.[16]

**Prosecution Expert**

Jim Cook, a former AT&T employee, testified as an expert on wireless cell phones. Cook explained that it was possible to track someone who had been using the pink cell phone based on the "family locater service plan" that defendant had for that cell phone. A monthly message would have been on the bill and sent to the cell phone, advising the user that it was part of a plan which permitting tracking. The cell phone had to stay on to track the device, and the battery would have lasted about one week without being recharged.

Cook also examined the records for defendant's personal cell phone. Based on calling signals to cell phone towers, whoever was using defendant's personal cell phone

---

[15] Based on this incident, defendant was charged with count VI, contempt of court on March 27, 2008. The jury was unable to reach a verdict and a mistrial was declared.

[16] Based on this incident, defendant was charged with count VII, contempt of court on May 7, 2008, and found not guilty.

was in Sewell's vicinity on January 26 (the movie theater incident), March 7–8 (the incident near Epperson's house), and March 15, 2008 (the assault at the apartment complex).

Cook confirmed that a call was placed from defendant's cell phone to Sewell's personal cell phone on March 27, 2008 (when she met with the district attorney and the investigator), and it lasted two seconds.

## DEFENSE EVIDENCE

### Defendant's Trial Testimony

Defendant denied that he stalked, harassed, or assaulted Sewell, or posted any disparaging e-mails or comments on social media about her. Defendant testified Sewell subjected him to emotional and physical abuse, and he became afraid of her. Sewell demanded that he spend large amounts of money to buy and furnish the Ellery home. She was very secretive and controlling, and she followed him around town. Sewell slapped and hit him on several occasions, and once threatened to harm him if he fooled around. Sewell became paranoid and accused defendant and his friends of organizing "this big conspiracy" against her, and thought someone was out to get her.

Defendant testified Sewell repeatedly threatened to ruin him and report false parole violations unless he did what she wanted. Defendant claimed Sewell called his business clients and tried to destroy his relationships with them, that Sewell's daughter tampered with his computer to damage his business, and that someone tampered with his cell phone so that it made calls without him using it. Defendant claimed that after an argument with Sewell, her daughter threatened: "[Y]ou are going to get yours."

Defendant testified Sewell never worked for him, and she never loaned any money for his businesses. When confronted with Sewell's cancelled checks for several thousands of dollars, defendant explained that Sewell paid for various expensive improvements she demanded for the Ellery home.

21.

As their relationship deteriorated, defendant realized he made a mistake to marry her. Sewell said she would return to Fontana only if defendant gave her $200,000. Sewell also demanded repayment for the improvements she financed at the Ellery home.

Defendant testified Alfred Willis, Sewell's uncle, worked for one of his construction companies, but defendant fired him for inappropriate conduct at work. Sewell was angry about that. Nevertheless, defendant claimed Willis regularly kept him informed about Sewell's actions, and revealed that Sewell was interfering with his business clients and trying to hurt him.

Defendant testified he never followed Sewell around, but she always seemed to be at the same place where he was. She left threatening and harassing messages on his voicemail. Defendant received telephone calls from unknown men who threatened to beat him. He felt he was being set up. Defendant admitted that after he was discharged from parole, he blocked his cell phone number and frequently called Sewell.

Defendant testified he regularly told Agent Mounts, his parole officer, about Sewell's alleged erratic and controlling behavior, her threats, and her physical abuse.

Defendant testified about the following specific incidents.

### *The DeYoung home*

Defendant testified he already owned the DeYoung home when he became involved with Sewell. After they decided to marry, Sewell demanded that he buy a larger house, and he purchased the Ellery home. Defendant moved into the Ellery home in January 2007, before he married Sewell. Sewell and her daughter moved into the Ellery home with him after they moved to Fresno.

Defendant testified that when he decided to separate from Sewell, he hired a U-Haul truck and told Sewell she was moving out of the Ellery home. Sewell "begged" to stay at the DeYoung home, and he agreed. Defendant testified Sewell "never paid a dime" of rent, and that Sewell, her daughter, and her uncle lived at the DeYoung home "rent free."

Defendant testified he paid the mortgage on the DeYoung home. He described the DeYoung home as "the rental where she stayed." Defendant testified he previously had "several different renters" who lived in the DeYoung home, and mentioned Richard Streets (presumably a tenant) and "some of my workers who use to stay in the house" previous to Sewell. Defendant testified that when Sewell moved into the DeYoung home, she "paid the PG&E at first. At first it was in Richard Streets' name and then transferred out to her name. She paid the PG&E but as far as anything else I paid."

Defendant testified he rekeyed the DeYoung locks when Sewell and her family moved in, and he kept one key and a garage door opener.

### *The garage incident at the DeYoung home*

Defendant admitted he approached defendant in the garage of the DeYoung home on January 17, 2008, and they argued about various things. He denied Sewell's version of the incident. He left the garage but returned because he dropped his wallet. He went into the house and they continued to argue. Defendant admitted he took the pink cell phone away from Sewell that day, but denied that he threatened, hit, or sat on top of her. Defendant claimed Sewell became very physical and tried to push him around.

Defendant testified he immediately called Agent Mounts after he left the DeYoung home and told him about the argument. Defendant was told to stay away from the DeYoung home.

### *Defendant's admissions about the burglary of the DeYoung home*

Defendant testified he did not know that a temporary restraining order was issued against him, but he knew that he had been told to stay away from the DeYoung home. Nevertheless, he decided to go to the DeYoung home on January 26, 2008, to pick up his business mail. Defendant testified that Willis, who he had just fired, warned him that Sewell intercepted his business mail and interfered with his clients. Defendant claimed he had never changed his business mailing address when he moved from the DeYoung to the Ellery home the prior year.

Defendant testified that he arranged for Willis to take Sewell to a movie that night. Defendant planned to use his key to get into the DeYoung house, pick up his mail, and leave.

Defendant further testified that he was still required to wear an electronic monitor as a condition of his parole. Defendant admitted he removed the monitor from his ankle and left it at his Ellery home because he did not want his parole officer to know he was at the DeYoung home.[17]

Defendant testified that when he arrived at the DeYoung home, he discovered Sewell had changed the locks, his key no longer worked, and he could not get in. He drove to the movie theater and tried to find Willis so he could get the new key, but Sewell saw him. Defendant testified he did not talk to or follow Sewell, and he went back to his car.

Defendant drove back to the DeYoung home and called a locksmith so he could get into the house. He also called Sewell's cell phone several times to make sure it went to voicemail and she was still in the theater.

Defendant testified that once the locksmith opened the front door at the DeYoung home, he went inside and retrieved his mail. Defendant decided to collect some DVDs which were stored in the closet under the stairs. He was still in the closet when Willis returned to the house and warned him that Sewell was outside. Willis told defendant to leave through the front door. Defendant walked out the front door. He saw Sewell and ran down the street. He did not talk to Sewell. (RT 3179-3182, 3344-3346, 3383)

---

[17] As we will discuss, *post*, Agent Mounts testified for the defense and admitted that defendant appeared in his office on January 22, 2008, said the electronic monitor was too tight, and asked if Mounts could loosen it so he could wear boots. Mounts did so. Agent Hagler testified defendant arrived at the parole office a few days after the January 26, 2008, incident at the DeYoung home, and Hagler checked his electronic monitor. Hagler determined it was "extremely loose," it "could have easily been slipped off," and it was "the loosest GPS ankle monitor I had ever seen."

### Parole violation hearing

Defendant testified Agent Mounts called him later that night about whether he had been at the DeYoung home. Defendant lied to Mounts and falsely said he never went to the DeYoung home, and he had been at the Ellery home all night with two friends. He lied because he knew he should not have been there. He just wanted to get his mail and "felt this was my house."

Defendant testified that on January 28, 2008, two days after he went into the DeYoung home, he put his electronic monitor back on his leg and went to the parole office. He met with another agent, who placed a tighter strap on his electronic monitor. He was later taken into custody and held in prison for a possible parole violation based on his entry into the DeYoung home.

On February 22, 2008, a parole violation hearing was held about the incident at the DeYoung home. At that hearing, Sewell testified she saw defendant outside the theater, he changed the locks to the DeYoung home, he was hiding in the closet, and he ran out the front door; Willis testified he found defendant hiding in the closet. Defendant falsely testified under oath that he spent the evening at his Ellery home with his two friends, they watched movies, and he injured his foot and could not run or walk. Defendant's two friends offered similar testimony. Defendant was found not to have violated parole and released.

### The incident at Epperson's house

Defendant testified that on March 7, 2008, an unknown man called him and claimed defendant's sister was harassing Sewell, and that man would do something to defendant if his sister did not stop. The man demanded they meet at a certain address and defendant agreed. Defendant drove to the area at night but no one was there.

When he could not find the unknown man, defendant testified he went to the Smokehouse, the restaurant/bar where Sewell and Epperson also went that night. Defendant claimed he did not know Sewell was there, and he never saw her. Defendant

testified that later that night, he left the Smokehouse and drove back to the area where he was supposed to meet the unknown man (which was apparently near Epperson's house). Defendant testified he suddenly saw Sewell's car and believed she was following him. Defendant thought he had been set up.

Defendant testified that on March 8, 2008, Sewell repeatedly called and threatened to put him back in prison. Defendant contacted the district attorney's office on March 11, 2008, and reported Sewell was stalking him, and he was afraid of her.

Defendant admitted that on or about March 16, 2008, he called Epperson twice even though he did not personally know her, and he blocked his number when he made the call. He believed Epperson helped Sewell interfere with his cell phone.

### *The incident at the Patterson Building*

Defendant testified that on March 12, 2008, he drove to the Patterson Building in downtown Fresno to meet with his divorce attorney, David Hollingsworth.[18] As he walked from his car, he saw Sewell outside the building. They stared at each other, and he went into the building. Defendant denied that he threatened or spoke to Sewell.

Defendant testified he left the building and headed back to his car. Sewell screamed that he wanted to kill her. Sewell ran after him, pulled out the Taser and fired it. The darts missed and Sewell rushed toward him. Defendant tried to stay away, but she chased him. The police arrived and he placed Sewell under a citizen's arrest. Defendant called Agent Mounts for help even though he had been discharged from parole, and Mounts arrived at the scene and spoke to the officers.

### *The pink cell phone*

Defendant testified he gave Sewell the pink cell phone when they were dating to reduce her long distance expenses. He denied that he listened to her voicemails when she

---

[18] Brit Warren, an employee in Hollingsworth's office, testified defendant had an appointment that day, and it had been on the calendar "for a little while."

used it. He took the pink cell phone away from her during the January 17, 2008, incident at the DeYoung home.

Defendant testified he never used the cell phone to track or follow Sewell, and he never placed it under her car.[19]

### *The assault in the apartment complex*

Defendant testified he did not assault Sewell in the apartment complex's garage on March 15, 2008. Defendant spent the day running errands and admitted he may have been in the vicinity of the apartment complex at one point, but he did not hide by the garbage dumpster or wait for her.

Defendant testified the police arrived at his house the next day and asked if he had seen her. Defendant said no, and he refused to speak with the police without his attorney.

Defendant testified he did not intentionally call Sewell on March 27, 2008, but he may have inadvertently hit her number on his cell phone.

## Agent Mounts

Parole Agent Andrew Mounts testified for the defense and said defendant performed well on parole and did not have any violations. Mounts testified that as defendant and Sewell were breaking up, defendant reported Sewell hit him and threatened to have his parole revoked unless he paid her $200,000. Defendant also said they reached an agreement that he would stay in the Ellery home, and she would live in the DeYoung home.

---

[19] Keisha Turner, defendant's niece, testified she lived in the Ellery home after defendant was taken into custody for the parole violation. During that time, she discovered several things had been taken from the home, including items which had belonged to Sewell, and she believed Sewell had gained entry and taken them. She told defendant, but she did not report this incident to the police. The defense relied on this incident to infer that Sewell took the pink cell phone from the Ellery home, and she had custody of it when it was discovered under her car.

Agent Mounts testified defendant called him immediately after the January 17, 2008, incident at the DeYoung home. Defendant reported they argued because he wanted a divorce, and Sewell prevented him from leaving the house. Sewell later spoke to Mounts about the same incident and claimed defendant regularly beat her. Sewell played the voicemail recording for Mounts, but he did not think it was dispositive. Mounts did not see any bruises on her. Mounts asked Sewell why she did not previously report these beatings. Sewell said she did not want to get defendant in trouble.

Agent Mounts testified he did not believe Sewell was credible when she reported these incidents because of how she behaved about money issues, based on his conversations with both of them. Mounts never took defendant into custody after Sewell's domestic violence reports because there was no corroborating evidence of Sewell's claims.

Agent Mounts admitted he told the investigating officers in this case that Sewell was not credible, she did not want to file charges, and she just wanted money from defendant.

Agent Mounts testified that on January 22, 2008, defendant appeared at the parole office and said the electronic monitor around his leg was too tight. He asked if Mounts could loosen it so he could wear boots, and Mounts agreed.

As for the January 26, 2008, burglary at the DeYoung home, Agent Mounts testified that a police officer called and advised him about the incident, and said they were sending units to defendant's Ellery home. Mounts called defendant and asked what happened. Defendant said he was at the Ellery home, two friends would support his story, and he hurt his foot and could not run. Mounts checked defendant's electronic monitor, and it showed he was at the Ellery home that night. Mounts later interviewed defendant's two friends, and they confirmed defendant was with them. During that investigation, Mounts told the police that Sewell had lied to him and had a credibility problem.

Mounts knew that on January 28, 2008, defendant arrived at the parole office to have his electronic monitor checked. Mounts was not at the office that day. Mounts admitted two other officers determined it was very loose and could be easily removed.

Mounts testified he was at the parole revocation hearing when defendant testified under oath that he was not at the DeYoung home on January 26, 2008.

In the course of his trial testimony, Agent Mounts admitted he did not know that defendant had just testified that he lied at the parole hearing – that he had removed his electronic monitor, he went to the theater and Sewell saw him, he hired the locksmith to get into the DeYoung home, and he was inside the house when Sewell returned.

Mounts testified defendant called him during the Taser incident at the Patterson Building. He asked Mounts to respond to the scene and tell the police that he was not on parole. Mounts did so even though defendant was no longer his responsibility. Mounts admitted he appeared at defendant's arraignment in this case and told the judge that he was a good parolee.

**Other Defense Witnesses**

Ray Culberson testified that in 2001, he dated Sewell for six months, they were engaged for one day, and they broke up. He did not have any contact with her after that. He believed she was not very truthful.

Roger Wilson, defendant's friend, testified he saw defendant and Sewell argue when they lived together. Wilson heard Sewell's daughter tell defendant that she was going to get him. After they separated, he heard Sewell say that she was going to bring defendant down. Wilson was impeached by his prior statements to an investigator, that he did not have any information about this case and had limited knowledge about defendant's relationship with Sewell.

Kenneth Wheeler, defendant's brother, testified he felt Sewell tried to separate defendant from his family, and she was not a truthful person. Defendant told his brother Sewell had slapped him during an argument.

Keisha Turner, defendant's niece, testified she lived with defendant and Sewell in the Ellery home. Sewell often argued with defendant, and Sewell threatened to report defendant to his parole officer. Turner testified that when they separated, defendant "made her go stay in the other house," but Sewell repeatedly returned to the Ellery home.

Kalea Turner, another niece, testified that in November 2007, she heard Sewell demand $250,000 from defendant, or she would ruin his life and send him back to prison. Turner was not present during this conversation, but testified that defendant accidentally hit speed dial on his cell phone and called her mother while he was arguing with Sewell. Turner and her mother answered the call, and they heard Sewell arguing and making demands.

Sharlene Dillard, defendant's sister and Kalea's mother, testified Sewell once told her that she would bring down defendant and take his money and life. Dillard also listened to the telephone call when defendant accidentally hit speed dial as he argued with Sewell, and she heard Sewell demand $250,000 or she would ruin his life. She also thought she heard the sound of someone being slapped. Sewell repeatedly made harassing telephone calls to her and threatened to get defendant. Dillard called Sewell and confronted her, and Sewell admitted she had interfered with defendant's business clients.

Thomas Blackburn testified as a defense expert and countered Jim Cook's analysis of defendant's cell phone records, and whether he was in certain locations. He also testified that if a cell phone was placed under a vehicle, the battery would have lasted only a few hours to two days without being charged.

## REBUTTAL EVIDENCE

Richard Streets, a correctional officer at juvenile hall, testified defendant had been his friend since high school, and Streets had lived at the DeYoung home for a few months. Streets had been one of defendant's alibi witnesses at the parole revocation hearing about defendant's burglary of the DeYoung home on January 26, 2008. At trial,

Streets repeated the story he told at the parole hearing: He went to the Ellery home around 10:00 p.m.; defendant and Ira Caples were there; defendant had injured his foot and walked with a limp; they watched movies; and defendant never left.

In the course of Streets's trial testimony, the prosecutor advised him that defendant had just testified that he left the Ellery home that night, he was not walking with a limp, he went to the DeYoung home, and he had lied at the parole hearing. The prosecutor asked Streets if defendant wanted him to lie about the burglary alibi. Streets said no, he did not remember what happened that night, and he may not have looked at his watch to know what time he was at the Ellery home.

John Hagler, a parole officer, testified that on the evening of January 26, 2008, he was on vacation at the coast with several friends, including Agent Mounts. Mounts received a telephone call from the police department because they were looking for defendant because of the DeYoung burglary. Mounts used Hagler's computer to check defendant's electronic monitor, and determined he was at the Ellery home. Hagler testified Mounts called defendant, and told him not to go outside his house or he would be arrested.

Agent Hagler testified he would not have given such advice to a parolee, and he later discussed Agent Mounts's conduct with other agents. Hagler believed Mounts should have arranged for defendant to be taken into custody as a safety precaution because of the burglary investigation.

Agent Hagler testified defendant reported to the parole office shortly after this incident. Agent Mounts was not present. Hagler checked his electronic monitor and determined it was "extremely loose," it "could have easily been slipped off," and it was "the loosest GPS ankle monitor I had ever seen." The officers tightened the strap so it could not be removed. Hagler was not called to testify at defendant's parole revocation hearing.

**The Charges, Verdicts, and Sentence**

Defendant was charged with count I, false imprisonment by violence, based on his entry into the garage and interior of the DeYoung home, and preventing Sewell from leaving, on January 17, 2008 (Pen. Code, § 236); count II, stalking from January 17, through May 7, 2008 (§ 646.9, subd. (a)); count III, first degree residential burglary, when he called the locksmith and entered the DeYoung home on January 26, 2008 (§§ 459 & 460, subd. (a)); count IV, corporal injury to a spouse/cohabitant, based on the assault on Sewell in the apartment's garage on March 15, 2008 (§ 273.5, subd. (a)); count V, misdemeanor disobeying a domestic relationship court order on March 15, 2008, based on his presence in the apartment's garage in violation of the restraining order (§ 273.6, subd. (a)); and counts VI and VIII, misdemeanor contempt of court on March 27 and May 7, 2008, based on Sewell's testimony that he called her cell phone.

Defendant's first jury trial ended in a mistrial. After his second jury trial, defendant was convicted of count II, stalking; count III, first degree burglary, and count IV, misdemeanor disobeying the court order on March 15, 2008. Defendant was found not guilty of count I, false imprisonment on January 15, 2008; and count VII, contempt of court on May 7, 2008.

The jury was unable to reach verdicts on count IV, infliction of corporal injury, based on the assault in the garage on March 15, 2008, and count VI, contempt of court on March 27, 2008. The court declared a mistrial and later granted the prosecution's motion to dismiss those counts.

The court found true all the special allegations: Six prior strike convictions and six prior serious felony enhancements.

Defendant was sentenced to consecutive third-strike terms of 25 years to life for count II, stalking, and count III, first degree burglary; plus five years for the prior serious felony enhancement.

**DISCUSSION**

## I. Defendant's conviction for first degree burglary

In count III, defendant was charged and convicted of first degree burglary of the DeYoung home on January 26, 2008, when he hired the locksmith, entered the DeYoung home while Sewell was at the movies, and was hiding in the closet when she returned.

On appeal, defendant contends the evidence was insufficient to support his burglary conviction because he owned the DeYoung home, that he had an unconditional possessory right to enter it, and that he did not violate the temporary restraining order because he knew Sewell was at the theater when he went into the house.

### A. Substantial evidence

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the

jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove [her] guilt beyond a reasonable doubt.' [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

### B. <u>Burglary</u>

"At common law, burglary was defined as ' "the breaking and entering of the dwelling of another in the nighttime with intent to commit a felony." ' [Citation.] Currently, burglary is defined as the entry into any building with the intent to commit a grand or petty larceny or any felony. [Citation.] Although the Penal Code has substantially changed some of the common law elements of burglary, our Supreme Court has held that 'two important aspects of that crime' remain: the entry must invade a possessory right in the building and it must be committed by one who has no right to be in the building. [Citation.]" (*People v. Smith* (2006) 142 Cal.App.4th 923, 929–930 (*Smith*).)

"Because the crime of burglary requires the invasion of a possessory right in a building, one cannot be found guilty of burglarizing one's own residence. [Citations.]" (*Smith*, *supra*, 142 Cal.App.4th at p. 930.) "[T]he reason why a person cannot be charged with burglarizing his own home is because he has an absolute right to enter his own home. [Citation.]" (*Id*. at p. 932.)

### C. *Sears* **and** *Gauze*

Defendant argues he could not be convicted of burglarizing the DeYoung home because he owned it. However, the resolution of this issue is dependent on more than simply the perpetrator's ownership of the residence. The applicable principles have been summarized as follows: "[S]ince burglary is a breach of the occupant's possessory rights,

34.

a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary *except* when he or she (1) has *an unconditional possessory right to enter as the occupant* of that structure or (2) is invited in by the occupant who knows of and endorses the felonious intent." (*People v. Salemme* (1992) 2 Cal.App.4th 775, 781, first italics in original, second italics added.)

The possessory right protected by section 459 is the "right to exert control over property to the exclusion of others" or, stated differently, the "right to enter as the occupant of that structure." (*People v. Salemme*, *supra*, 2 Cal.App.4th at pp. 779, 781.) The "primary purpose" of the burglary law "is to protect a possessory right in property. Thus, if there is an invasion of the occupant's possessory rights, the entry constitutes burglary regardless of whether actual or potential danger exists." (*Id*. at p. 781.)

These principles were developed in a series of cases beginning with *People v. Sears* (1965) 62 Cal.2d 737 (*Sears*)[20], where the defendant and his wife had lived together in the family residence. They separated, the defendant moved to a hotel, and his wife and stepchildren remained in the house. Three weeks later, the defendant entered the house through an unlocked door, assaulted his wife with a pipe he had concealed under his shirt, and killed his stepdaughter. The defendant was convicted of first degree felony murder based on burglary. (*Id*. at pp. 740–741.)

*Sears* reversed the defendant's conviction based on the erroneous admission of the defendant's postarrest statements, and remanded for a new trial. For guidance on retrial, however, the court held the jury was properly instructed on felony murder based on the defendant's commission of a burglary when he entered the family residence. (*Sears*, *supra*, 62 Cal.2d at pp. 740, 746.)

---

[20] *Sears* was overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17.

"We reject defendant's contention that the court should not have given the burglary instruction because defendant, as [the wife's] husband, had a right to enter the family home. One who enters a room or building with the intent to commit a felony is guilty of burglary *even though permission to enter has been extended to him personally* or as a member of the public. [Citation.] The entry need not constitute a trespass. [Citations.] *Moreover, since defendant had moved out of the family home three weeks prior to the crime, he could claim no right to enter the residence of another without permission.* Even if we assume that defendant could properly enter the house for a lawful purpose [citation], such an entry still constitutes burglary if accomplished with the intent to commit a felonious assault within it." (*Id*. at p. 746, italics added.)

The seminal case in this area is *People v. Gauze* (1975) 15 Cal.3d 709 (*Gauze*), which distinguished *Sears* in a situation where defendant shared an apartment with two roommates. The defendant argued with one roommate while they were at a friend's house. The roommate returned to their apartment. The defendant borrowed a shotgun from a neighbor, entered the apartment, and shot and wounded the roommate. The defendant was convicted of burglary and assault with a deadly weapon. (*Id*. at p. 711.) The California Supreme Court reversed his burglary conviction and held the defendant had the absolute possessory right to enter the apartment as a cotenant, and he could not be convicted of burglarizing his own residence. (*Id*. at pp. 714, 717.)

"[Defendant's] entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation; only the entry of an intruder could have done so. More importantly, *defendant had an absolute right to enter the apartment*. This right, unlike that of the store thief …, did not derive from an implied invitation to the public to enter for legal purposes. It was a personal right that could not be conditioned on the consent of defendant's roommates. Defendant could not be 'refused admission at the threshold' of his apartment, or be 'ejected from the premises after the entry was accomplished.' [Citation.] He could not, accordingly, commit a burglary in his own home." (*Id.* at p. 714, italics added.)

*Gauze* clarified that it was not overruling *Sears* and distinguished that case because the husband's right of entry in *Sears* "was at best conditional" and his "entry for anything but a legal purpose was a breach of his wife's possessory rights." (*Gauze*,

*supra*, 15 Cal.3d at p. 715.)  In contrast, the defendant in *Gauze* had an unconditional right to enter the apartment where he was living.  (*Ibid.*)

> "In contrast to the usual burglary situation, no danger arises from the mere entry of a person into his own home, no matter what his intent is.  He may cause a great deal of mischief once inside.  But no emotional distress is suffered, no panic is engendered, and no violence necessarily erupts merely because he walks into his house.  To impose sanctions for burglary would in effect punish him twice for the crime he committed while in the house. In such circumstances it serves no purpose to apply section 459."
> (*Id*. at p. 716, fn. omitted.)

The principles set forth in *Gauze* and *Sears* have been reaffirmed through the years:  "[O]ne may be convicted of burglary even if he enters with consent, provided he does not have an unconditional possessory right to enter."  (*People v. Pendleton* (1979) 25 Cal.3d 371, 382.)  These principles have been applied to uphold burglary convictions against estranged spouses who enter the former family residence in situations which undermine perpetrators' claim of consent and/or an "unconditional possessory right to enter."  (*Ibid.*; see, e.g., *People v. Davenport* (1990) 219 Cal.App.3d 885, 890–892; *People v. Smith*, *supra*, 142 Cal.App.4th at pp. 931–932; *People v. Gill* (2008) 159 Cal.App.4th 149, 161 (*Gill*); *People v. Ulloa* (2009) 180 Cal.App.4th 601, 607–609.)

### D.  Analysis

There is clearly substantial evidence to support defendant's conviction for the burglary of the DeYoung home on January 26, 2008, because (1) he did not have an unconditional possessory right, and (2) he was not invited to enter by an occupant who knew and endorsed his felonious intent.  (*People v. Salemme, supra,* 2 Cal.App.4th at p. 781.)

First, defendant's ownership of the residence is not dispositive of whether he had an unconditional possessory right to enter the house.  In contrast to *Gauze*, there is no evidence he had such a right on January 26, 2008.  There is no evidence that defendant lived at the DeYoung home with Sewell during or after their marriage, that it was the

family residence prior to their separation, or that he lived in the DeYoung home after he moved to the Ellery home. Defendant's own testimony supports the contrary finding – defendant testified he moved to the Ellery home in January 2007, he treated the DeYoung home as a rental property, and he identified some of his tenants. Sewell joined him in the Ellery home after she moved to Fresno on August 1, 2007, and Sewell moved to the DeYoung home when she left defendant on September 1, 2007.

Defendant contends he still had an unconditional possessory right to enter the DeYoung home because he spent time with Sewell "at both houses" after their separation, between September 2007 to mid-January 2008, as they tried to work out their marital problems. (AOB 20) The record refutes this argument. The family never lived in the DeYoung home prior to the separation, and defendant's limited visits to the DeYoung home after their separation were so contentious that Sewell changed the locks and obtained the restraining order.

Defendant asserts he did not lease the DeYoung home to anyone, he "simply had his wife living in that house," she did not pay rent, and he never gave up his unconditional right to enter the house. Again, this argument is contrary to the evidence of their separation. Both Sewell and defendant testified that tenants lived in the DeYoung home after defendant moved into the Ellery home. Sewell testified she decided to leave defendant and asked to live in the DeYoung home. Sewell testified defendant owed her a large amount of money, they agreed that her rent for the DeYoung home would be deducted from his debt, and she moved into the DeYoung home on September 1, 2007.

Defendant testified to the contrary and claimed he ordered Sewell to move out of the Ellery home and return to Fontana, she begged him to stay in Fresno, and he allowed her to live in the DeYoung home rent free. However, Sewell's testimony provides substantial evidence that he agreed she could live in the DeYoung home as a tenant and

her rent would be deducted from the large debt that defendant owed her as a result of her loans to him.

Defendant's ownership of the DeYoung home was similar to the landlord/tenant situation which was found dispositive in *Smith*, where the defendant was convicted of burglary, kidnapping and attempted murder when he broke into the former family residence and attacked his former wife. Prior to the burglary, the victim had obtained a restraining order against him, and the family court issued an order which removed the defendant from the house and granted sole possession to the victim. (*Smith*, *supra*, 142 Cal.App.4th at p. 929.) In rejecting defendant's claim of an unconditional possessory right to enter, *Smith* drew an analogy with landlord/tenant cases:

> "When a landlord leases property to a tenant, the landlord retains a qualified possessory interest in the property. The landlord's possession of the leased property is qualified because the possessory interest in the property is vested in the tenant during the lease term. Thus, if the landlord were to break into the tenant's apartment and commit a felony, the landlord could be charged with, and convicted of, committing a burglary. Regardless of the fact that the landlord has a possessory interest in the apartment by virtue of the fact that he or she owns the property, *such interest is qualified because he does not possess the right to enter as the occupant during the lease period.*
>
> "In this case, [defendant's wife] was awarded sole possession of the family home and she was granted a temporary restraining order … against defendant because of his acts of violence towards her. Thus, although defendant had a possessory interest in the family home, he did not possess the right to enter as an occupant when [she] was present. [His wife], on the other hand, retained the right to enter as an occupant at any time. Given the distinction, defendant could be charged with burglary of the family home just like a landlord could be charged with burglary of the tenant's property." (*Smith*, *supra*, 142 Cal.App.4th at p. 932, italics added.)

As the owner and landlord of the DeYoung home, defendant retained a possessory interest when he rented the DeYoung home to various tenants, but it was a "qualified" possessory interest since that interest was vested in the tenant. (*Smith*, *supra*, 142 Cal.App.4th at p. 932; see also *Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair &*

39.

*Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190–1191 [a lessee has exclusive possession of the premises against all the world, including the owner/lessor, who has a future reversionary interest and retains fee title].) Under these circumstances, defendant could be convicted of burglary "just like a landlord could be charged with burglary of the tenant's property." (*Smith*, *supra*, 142 Cal.App.4th at p. 932.)

Even if Sewell lived in the DeYoung house "rent free," as claimed by defendant, he still did not have an unconditional possessory right to enter on January 26, 2008. After Sewell left defendant and moved into the DeYoung home, defendant was aware that "clearly … circumstances had changed." (*Gill*, *supra*, 159 Cal.App.4th at p. 161.) A temporary restraining order had been issued against him.[21] Moreover, defendant admitted his parole agent had ordered him to stay away from the DeYoung home after his confrontation at the DeYoung house with Sewell on January 17, 2008. Most importantly, defendant realized that Sewell had changed the locks to the house. Given these circumstances, defendant was clearly aware that circumstances had changed, and his conduct on January 26, 2008, demonstrated that he "understood he did not have the right to enter the residence at will." (*Gill*, *supra*, 159 Cal.App.4th at p. 161.)

Defendant asserts that, contrary to the situation in Smith, the restraining order did not "take away" his unconditional possessory right to enter because he knew Sewell was at the movie theater that night, and the court never granted sole possession of the house to Sewell. However, the temporary restraining order ordered defendant not to "harass, attack, strike, threaten, assault, sexually or otherwise, hit, follow, stalk, molest, *destroy personal property*, disturb the peace, keep under surveillance or block movements" of Sewell, her daughter, and her uncle; and that he had to stay at least 100 yards away from

---

[21] While defendant claimed he did not know about the order, the prosecution introduced evidence that the order was served on a man at the Ellery home who identified himself as defendant.

them and their cars.  (Italics added.)  Defendant had already violated the restraining order when he appeared outside the movie theater and followed defendant around the shopping center.  He rushed the locksmith and seemed to know that Sewell was about to return.  Even if he knew Sewell was not home when he entered, he had already destroyed "personal property" when he had the locksmith open the front door, which apparently damaged the lock and made it difficult for Willis to unlock it upon their return.

Clearly, defendant's conduct on January 26, 2008, demonstrated his understanding that "he did not have the right to enter the residence at will."  (*Gill*, *supra*, 159 Cal.App.4th at p. 161.)  Despite the restraining order and his parole agent's warnings, defendant carefully arranged for an alibi by convincing his parole agent to loosen his electronic monitor a few days earlier, and he admittedly left it at the Ellery home so it would appear he had never left his own house.  He followed Sewell until she went into the movie theater, drove to the DeYoung home, and found out Sewell had changed the locks.  Nevertheless, he pressed ahead and called the locksmith, entered the house, and waited in the closet under the stairs for Sewell to return.  (See, e.g., *People v. Ulloa*, *supra*, 180 Cal.App.4th at pp. 610–611.)

There is also no evidence defendant was invited to enter the DeYoung home by an "occupant who knows of and endorses the felonious intent."  (*People v. Salemme*, *supra*, 2 Cal.App.4th at p. 781.)  Sewell, her daughter, and her uncle lived in the house, and they were protected by the restraining order.  Defendant claimed he had just fired Willis but that Willis told him that Sewell had intercepted his business mail, and Willis agreed to take Sewell to the movies so defendant could get into the house and get his mail back.

Willis testified to a different version of events:  He did not arrange for defendant to get into the house that night; they could not open the front door when they returned home; he managed to get into the house through the garage; he notice the light in the closet; he heard breathing inside the closet; he opened the closet door; he walked to the farthest corner; and he was surprised when he found defendant stooped in the back.

41.

Willis never testified that he kept defendant informed of Sewell's activities or arranged for defendant to get into the house that night. There was thus substantial evidence to refute any claim that defendant entered with the consent of one of the residents.

We conclude there is overwhelming evidence to support defendant's conviction for burglary. While defendant owned the DeYoung home, he never lived there with Sewell. It was not the family residence. He treated it as a rental property before they separated; he agreed Sewell could live there after the separation; and the rental fee would be deducted from the large amount of money that he owed her. In addition, defendant knew about the restraining order and that Sewell and changed the locks, and Willis refuted defendant's claim that he consented to defendant's entry into the house that night.

## II. Burglary Instructions

Defendant raises another challenge to his burglary conviction. Defendant argues the court had a sua sponte duty to instruct that the jury "had to find [defendant] did not have an unconditional possessory right to enter" the DeYoung home to find him guilty of burglary. He also argues the jury received a special instruction on burglary which was legally incorrect because it failed to set forth this principle, and it allowed the jury to rely on the existence of the temporary restraining order as evidence that he did not have the unconditional possessory right to enter the DeYoung home.

### A. Instructions

The jury received the following modified pattern instruction on the elements of count III, burglary:

> "To prove that the defendant is guilty of this crime, the People must prove [one] that the defendant entered a … residential building; and, two, when the defendant entered the residential building, he intended to commit a felony, including spousal abuse, false imprisonment by violence, or stalking.

> "To decide whether the defendant intended to commit spousal abuse, false imprisonment by violence or stalking, please refer to the separate

42.

instructions I will give you on those crimes; that would also include attempted false imprisonment by violence.

"A burglary was committed if the defendant entered with the intent [to] commit spousal abuse, false imprisonment by violence, or attempted or stalking.

"The defendant does not need to have actually committed those crimes as long as he entered with the intent to do so. The People do not have to prove the defendant actually committed those crimes.

"The People allege that the defendant intended [to] commit spousal abuse, false imprisonment by violence or attempted, or stalking. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended.

"If you find the defendant guilty of the burglary, I instruct you that it is burglary of the first degree."

Defendant's claim of instructional error is based on the following special instruction, which the court gave at the People's request and immediately followed the above instruction on the elements of burglary.

"A defendant can be found guilty of residential burglary of his own residence, if the People prove beyond a reasonable doubt that the defendant does not have an unconditional possessory right to enter his own residence. The existence of a court restraining order forbidding contact by the defendant [toward the victim] or the victim's residence is evidence from which you may, but are not required, to conclude that the defendant did not have an unconditional possessory right to enter the residence on DeYoung Avenue.

"In order to convict the defendant of the crime of first degree residential burglary, each of the elements listed in Instructions 1700 must be proved beyond a reasonable doubt." (Italics added.)

Defendant did not object to this special instruction.

**B.  Analysis**

Defendant asserts that while the first sentence of the special instruction addressed the possessory right to enter, the court had a sua sponte duty to instruct that defendant

43.

could "only be found guilty of residential burglary if he did not have an unconditional possessory right to enter the residence," and the special instruction permitted the jury to find him guilty simply based on the elements stated in CALCRIM No. 1700, which did not include the issue of whether he had an unconditional possessory right to enter.[22]

However, the special instruction unambiguously advised the jury that defendant could be convicted of burglary of the DeYoung home if the People proved "beyond a reasonable doubt that the defendant does not have an unconditional possessory right to enter his own residence." While this language was not included in CALCRIM No. 1700, the special instruction immediately followed the pattern instruction, and we determine the correctness of jury instructions from the entire charge of the court, rather than by judging an instruction or portion of an instruction in artificial isolation. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

Defendant further argues that the special instruction was incorrect because it allowed the jury to rely on the existence of the temporary restraining order as evidence that he did not have the unconditional possessory right to enter the DeYoung home. The special instruction stated that the existence of the restraining order was evidence from which the jurors "may, but are not required, to conclude" he did not have an unconditional possessory right to enter the DeYoung home. This language raised a permissive rather than a mandatory inference. (See, e.g., *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1226.) "[W]hen used in appropriate cases, permissive inferences do not shift the burden of production or lower the prosecution's burden of proof. Because they may or may not be drawn by the jury, they do not operate in an unconstitutionally pernicious manner." (*People v. Beltran* (2007) 157 Cal.App.4th 235, 244.) " 'A permissive inference does not relieve the State of its burden of persuasion because it still

---

[22] Defendant did not object to the burglary instructions and has not claimed his attorney was ineffective for failing to do so. However, he claims these instructional errors omitted elements of the offense and reduced the prosecution's burden of proof.

requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved…. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. [Citation.]' [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.)

Such a permissive inference was clearly supported by the facts of this case. Defendant argued he never intended to violate the restraining order because he purposefully entered the DeYoung home when he knew Sewell was not there. However, defendant's conviction for burglary did not solely rest on the existence of the temporary restraining order, or his intent to violate that order. There was substantial evidence he did not have an unconditional possessory right to enter because he treated the DeYoung home as a rental property, Sewell paid rent through the deduction against his debt, his parole agent told him to stay away from the house, and he discovered Sewell had changed the locks. The restraining order was just another factor for the jury to consider.

## III. Imposition of Consecutive Sentences

Defendant was charged and convicted of count II, stalking from January 17 through May 7, 2008; and count III, first degree burglary on January 26, 2008. The court imposed two consecutive third-strike terms of 25 years to life for counts II and III. The court did not make any findings as to the potential application of section 654 to the consecutive sentences.

Defendant contends the consecutive terms violated section 654 because defendant's burglary conviction was based on his intent to commit the felony of stalking, such that both counts II and III were committed with the same intent and objective.

### A. Section 654

Section 654 provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be

45.

punished under more than one provision." (§ 654, subd. (a).) A course of conduct that constitutes an indivisible transaction violating more than a single statute cannot be subjected to multiple punishment. (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1248.)

However, "multiple crimes that arise from a single course of criminal conduct may be punished separately, notwithstanding section 654, if the acts constituting the various crimes serve separate criminal objectives. [Citations.]" (*People v. Davey* (2005) 133 Cal.App.4th 384, 390.) "[I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citations.] The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple. Each case must be determined on its own facts. [Citations.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

"When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective. [Citation.]" (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) We will uphold a trial court's explicit or implicit finding if it is supported by substantial evidence. The trial court's determination is viewed in the light most favorable to the People, and we presume the existence of every fact that could reasonably be deduced from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

B. **Analysis**

Defendant asserts his consecutive sentences for burglary and stalking violated section 654 because "ordinarily, if the defendant commits both burglary and the underlying intended felony, ... section 654 will permit punishment for one or the other but not for both. [Citations.]" (*People v. Centers* (1999) 73 Cal.App.4th 84, 98–99.)

Defendant argues this principle applies to this case because his conviction in count III was for burglary of the DeYoung home with the intent to commit a stalking offense.

As to count III, however, the jury was instructed that in order to find defendant guilty of burglary, it had to find that defendant entered the residence with the intent to commit a felony, "*including* spousal abuse, false imprisonment by violence, *or* stalking." (Italics added.) The jury was further instructed that it could convict defendant of burglary even if defendant did not actually commit spousal abuse, false imprisonment by violence, or stalking, "as long as he entered with the intent to do so," that the jury did not have to agree on which of those crimes he intended to commit, and the People did not have to prove "the defendant actually committed those crimes."

The evidence in support of defendant's burglary conviction supported the inference that he intended to commit one or all of these alleged felonies when he removed his electronic monitoring device and left it at his Ellery home; arranged for two friends to provide a false alibi at the Ellery home; called a locksmith when he realized his own key did not work, then entered the DeYoung home, secured the front door, and furtively hid in the closet under the stairs as he awaited Sewell's return. His plans were thwarted when Willis discovered him hiding in the closet.

Defendant argues there is no evidence he entered the house to commit false imprisonment or spousal abuse, but the evidence only supported a finding he entered to commit a stalking offense. However, defendant's conduct seemed contrary to his prior and subsequent stalking activities, where he parked his car and watched Sewell, appeared at the same public place, or followed her around by car or on foot. In contrast to the prior incidents where he wanted Sewell to know he was watching her, defendant's hurried efforts to call the locksmith, get into the house, and hide in the closet under the stairs as he waited for Sewell to return, are more consistent with his intent to commit an assaultive offense upon her return.

47.

Even if defendant burglarized the DeYoung home to commit a stalking offense, his convictions for burglary and stalking are not based on an indivisible transaction. The elements of stalking are "(1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear of death or great bodily injury. [Citation.]" (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210.) One need not inflict physical harm on another person, or damage property, to stalk a victim. (*Ibid.*) The offense of stalking cannot be completed instantaneously but comprises a series of repeated acts over a period of time, which the perpetrator intends to engender a prolonged state of fear and intimidation. (*Ibid.*)

Defendant's conviction for stalking was not solely based on his single act of burglarizing the DeYoung home on January 26, 2008, but a series of events which he committed over five months, from January 17 through May 7, 2008: His sudden entry into the garage as Sewell returned to the DeYoung home on January 17, 2008; his admitted presence at the same bar where Sewell and Epperson were, and his appearance at Epperson's home on March 7, 2008, as Sewell drove back to Epperson's house; his presence near Sewell's car as she left her attorney's office, and his conduct as he walked by and threatened her at the Patterson Building on March 13, 2008; the discovery of the pink cell phone under her car, which was likely used as a tracking device, even if that period was limited by the cell phone's battery; and his presence in the garage at Sewell's apartment on March 15, 2008, on the night she was violently beaten.[23]

Based on the record of this case, there is substantial evidence that the acts which comprised defendant's stalking behavior, committed from January 17 to May 7, 2008, were independent of and not incidental to his burglary of the DeYoung home on January

---

[23] While the jury was unable to reach a verdict on count IV, corporal injury to a spouse, based upon the assault in the garage, it found defendant guilty of misdemeanor disobeying a domestic relations court order on the same date. (§ 273.6, subd. (a).)

26, 2008, and his conduct was not part of an indivisible transaction which would preclude multiple punishment.

## IV.    **Presentence Conduct Credits**

Defendant contends, and the People concede, the court erroneously limited his presentence conduct credits to 15 percent of his actual time in custody under section 2933.1.  The People agree section 2933.1 does not apply to this case, and defendant should have received a total of 2,552 days of presentence credits (1702 actual days plus 850 days of credits).

## DISPOSITION

The trial court is directed to amend the abstract of judgment to reflect 2,552 days of presentence credits (1702 actual days plus 850 days of credits) and to transmit copies of the amended abstract to the appropriate parties and entities.  In all other respects, the judgment is affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Peña, J.

49.